## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| *ex rel.* | : | FILED UNDER SEAL |
| CHRISTINA M. ROSS, | : | PURSUANT TO 31 U.S.C. §3730 |
| REX GARDNER, | : | |
| REBECCA GORDON, | : | |
| JOSEPH MOORE, and | : | |
| CAROLE CHASMAR, | : | |
| | : | |
| Plaintiffs, | : | Civil Action No. 11-cv-7027 |
| | : | |
| v. | : | |
| | : | |
| GENESIS HEALTHCARE LLC | : | |
| GENESIS HEALTHCARE CORP. | : | |
| GENESIS REHABILITATION | : | |
| SERVICES, LLC, | : | |
| GENESIS ELDERCARE | : | |
| REHABILITATION SERVICES, and | : | |
| JOHN DOES NOS. 1-50 | : | |
| | : | |
| Defendants | : | |

---

## AMENDED CONSOLIDATED COMPLAINT

Plaintiffs-Relators Christina Ross, Rex Gardner, Rebecca Gordon, Joseph Moore, and

Carole Chasmar, on their own behalf and on behalf of the United States of America ("United

States") and the states of Connecticut, Delaware, Maryland, Massachusetts, New Hampshire,

New Jersey, North Carolina, Rhode Island, and Virginia, (collectively, the "States"), and the

District of Columbia pursuant to the qui tam provisions of the federal False Claims Act, 31

U.S.C. §§ 3729 *et seq.*, and the analogous False Claims Acts of the States and the District of

Columbia, Plaintiff-Relators ("Relators"), by their undersigned counsel, bring this *qui tam* action

against Defendants Genesis Healthcare LLC, Genesis Healthcare Corp., Genesis Rehabilitation

Services, LLC, and Genesis Eldercare Rehabilitation Services and John Does Nos. 1-50, and allege as follows:

## I.      Preliminary Statement

1.      This is a civil action arising under the laws of the United States to redress violations of 31 U.S.C. §§ 3729(a)(1)(A), (B), and (C), and 3729(a)(1) and (2) (as amended).

2.      This suit is not based upon prior public disclosures of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit or investigation or in a Government Accounting Office or Auditor General's report, hearing, audit, or investigation, or from the news media.

3.      To the extent that there has been a public disclosure unknown to Relators, they are original sources under 31 U.S.C. § 3730(e)(4). Relators have direct and independent knowledge of the information on which the allegations are based.

4.      Before filing this Complaint, Relators made disclosures of all material evidence and information in their possession to the Government, as required by 31 U.S.C. § 3730(b)(2).

## II.      Jurisdiction and Venue

5.      This court has jurisdiction over the subject matter of this action: (i) pursuant to 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S. C. §§ 3729 through 3730; and (ii) pursuant to 28 U.S.C. § 1331, which confers federal subject matter jurisdiction.

6.      This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants can all be found in, reside in, and/or transact business in this

District. In addition, this Court has personal jurisdiction over Defendants because Defendants'

acts prohibited by 31 U.S.C. § 3729 *et seq.* occurred within this District.

7.      Venue is proper pursuant to 31 U.S.C. § 3732(a) because Defendants transact

business and have their corporate headquarters within this District, and numerous acts proscribed

by 31 U.S.C. § 3729 occurred within this District.

### III.    Parties

8.      The United States is the Plaintiff and real party in interest for whom recovery is

sought for false and fraudulent claims submitted to the United States, as well as for the use of

false records or statements in conjunction with the payment of a false claim and/or material to a

false or fraudulent claim.

9.      Relator Christina Ross (Ross) is a citizen of the United States who resides in the

Commonwealth of Pennsylvania. From February 2011 to August 2011, Ross was employed by

Defendant Genesis Rehabilitation Services LLC ("Genesis Rehab") as a licensed and registered

occupational therapist. Ross worked primarily at a Genesis Rehab facility in Lansdale,

Pennsylvania, located within the Elm Terrace Gardens assisted living/nursing home/retirement

community. Ross also was assigned to work on a temporary basis at other Genesis Rehab

facilities, including those located within the following assisted living/nursing home/retirement

communities - Springhouse Estates, Lower Gwynedd, Pennsylvania; and Brittany Pointe,

Lansdale, Pennsylvania.

10.     Relator Joseph Moore (Moore) is a citizen of the United States who resides at

11627 Vantage Hill Road, Unit 21, Reston, Virginia. He has a doctoral degree in occupational

therapy and has been active in the clinical practice of therapy for over 13 years. He has also

served as Director of Rehabilitation and has extensive experience in the field of occupational and related therapies. During the relevant periods of time addressed in this Complaint, Moore worked for Genesis Healthcare LLC through their subsidiary Genesis Rehabilitation Services LLC in four sub-acute facilities that had retained Genesis to provide their skilled therapy services.

11.     Relator Carole Chasmar (Chasmar) is a citizen of the United States who resides at 192 Claremouth Avenue, Apartment 21, Montclair, New Jersey 07042. She has been a practicing occupational therapist for over 12 years. She has also worked as a Rehabilitation Manager and is familiar with Medicare billing guidelines. On or about May 17, 2010, Chasmar started working for Genesis Rehabilitation Services LLC, at a facility located at 700 Town Bank Road, North Cape May, New Jersey, 08204, where she worked until the end of August 2010. Genesis Rehabilitation Services LLC controlled the provision of skilled therapy services at that facility and employed the therapists.

12.     Relator Rebecca Gordon (Gordon) is a citizen of the United States who resides in North Sutton, New Hampshire. She is a licensed occupational and she was employed by Genesis from November 9, 1999 to February 10, 2012 at various facilities serviced by Genesis in North Carolina and New Hampshire, including the Rockingham County Nursing Home ("Rockingham") in Brentwood, New Hampshire.

13.     Relator Rex Gardner (Gardner) is a citizen of the United States who resides in the State of Virginia. He was, up until December 31, 2012, employed by Genesis Rehabilitation Services LLC as a speech therapist working at Skilled Nursing Facilities ("SNF") rehabilitation centers in and around Alexandria, Virginia, including Mount Vernon Nursing and Rehabilitation Center ("MVNRC"), which is located in Arlington, Virginia.

14.     Defendant Genesis HealthCare, LLC ("Genesis Healthcare") is a Delaware limited liability company with its headquarters in Kennett Square, Pennsylvania.  Defendant Genesis HealthCare Corporation, formerly known as Genesis Healthcare Inc., is the parent corporation of Genesis Healthcare, LLC and owns 10% or more of Genesis Healthcare, LLC's stock.

15.     Defendant Genesis Rehabilitation Services, LLC ("Genesis Rehab") is a Commonwealth of Pennsylvania limited liability company created on or about February 28, 2008. Genesis Rehab provides long-term skilled occupational, physical, and speech therapy services in 28 states and the District of Columbia. Genesis Rehab furnishes skilled therapy services to residence of various skilled nursing facilities/assisted living/retirement communities, which Genesis Rehab operates.  Its principal place of business and corporate headquarters are located in Kennett Square, Pennsylvania.

16.     Defendant Genesis Eldercare Rehabilitation Services, Inc. ("Genesis Eldercare") is a Commonwealth of Pennsylvania corporation created on or about November 1986.  Eldercare does business as Genesis Rehabilitation Services.  Its principal place of business and corporate headquarters are located in Kennett Square, Pennsylvania.

17.     Defendant Genesis HealthCare Corporation, formerly known as Genesis Healthcare Inc. ("Genesis HealthCare Corp."), is a Commonwealth of Pennsylvania domestic corporation created on or about May 19, 2003. Genesis HealthCare Corp. is the parent company of Genesis Rehab, with the ability to control the operations of each facility.

18.     Defendant Genesis Healthcare Corp. is a holding company with subsidiaries that, on a combined basis, comprise one of the nation's largest post-acute care providers with more than 500 skilled nursing centers and assisted/senior living communities in 34 states nationwide.

5

Genesis subsidiaries also supply rehabilitation and respiratory therapy to more than 1,800 healthcare providers in 47 states and the District of Columbia.

19.     In 2007, Formation Capital, LLC and JER Partners bought out Genesis HealthCare (formerly publicly traded on NASDAQ under the ticker symbol GHCI) and privatized the company. The publicized transaction was valued at $2 billion.

20.     Effective December 3, 2012, Defendant Genesis Healthcare LLC acquired Sun Healthcare Group Inc. Under the terms of the acquisition, Genesis Healthcare acquired Sun Healthcare Group Inc. for $8.50 per share of common stock in cash, with a transaction value of approximately $275 million net of cash and acquired debt.   On a combined basis the two companies are generating approximately $4 billion dollars in annual revenues, with significant revenues flowing from the provision of skilled therapies billed under Medicare and TRICARE.

21.     Genesis HealthCare Corp. recently announced that, effective February 2, 2015, it completed its previously announced combination with Skilled Healthcare Group, Inc. The combination of the two companies created one of the largest post-acute care providers in the country, with more than 500 skilled nursing centers in 34 states.  It has also expanded Genesis HealthCare Corp.'s rehabilitation therapy business, Genesis Rehab Services, to more than 1,800 service locations in 47 states and the District of Columbia.  The Combined Company began trading on the NYSE with a new ticker symbol of GEN.

22.     As part of its corporate scheme to defraud Medicare, Genesis Rehab partners with various skilled nursing facilities ("SNFs") around the country. Defendants John Does Nos.1-50 are to-date unknown individuals, corporations, limited liability companies, SNFs or other lawful business entities through which Genesis Healthcare and Genesis Rehab does business with in the United States, and who are unknown co-conspirators who conspired with Defendants to

perpetuate the scheme of fraud as described herein.  To the extent that any of the conduct or activities described in this Complaint were not performed by the named Defendants, but by the individuals or entities described herein as John Does Nos. 1-50, fictitious names, any reference herein to Genesis Healthcare and Genesis Rehab under such circumstances, and only under such circumstances, refers also to John Does Nos. 1-50 and/or other co-conspirators who conspired with Defendants to perpetrate the schemes described herein and may have assisted in the transmission of fraudulent invoices to Government Programs.

23.     Genesis' rehabilitation division, including its subsidiary Genesis Rehab Services, provides speech, physical and occupational therapy services through contracts with other healthcare providers and SNFs, as outlined herein.  As set forth herein, Defendants' scheme to overbill Government Programs is a corporate-wide endeavor that is taking place throughout the Genesis chain and costing the Medicare, Medicaid and TRICARE programs hundreds of millions in fraudulently procured claims.

### IV. The Government Health Programs at Issue

### A. Medicare Programs

24.     The Medicare Program ("Medicare") is the federal health insurance program for the aged and disabled established by Congress in 1965 as Title XVIII of the Social Security Act and codified at 42 U.S.C. § 1395, et seq.  Medicare is administered through the Centers for Medicare and Medicaid Services ("CMS"), formerly the Health Care Financing Administration ("HCFA").  CMS is a division of the United States Department of Health and Human Services ("HHS").  Defendants are certified and approved as providers or suppliers under the Medicare Program.

7

25.     Medicare reimburses health care providers for specified health care services furnished to certain population groups, including the disabled and persons over 65.  Persons eligible for Medicare reimbursed services are referred to as "beneficiaries."  Currently, Medicare provides insurance coverage for over 40 million Americans, including many who require skilled therapy services.

26.     The Medicare Program is divided into three parts: (a) hospital insurance (also known as "Part A"); (b) supplementary medical insurance (also known as "Part B"), which pays for covered services rendered to beneficiaries in SNFs under both Part A and Part B of the Program; and (c) Part C of the Medicare Program, or "Medicare + Choice," which provides healthcare options in addition to basic Medicare benefits.  *See* 42 U.S.C. §§ 1395 through 1395i-5 (Part A – Hospital Insurance Benefits for the Aged and Disabled); See also 42 U.S.C. §§ 1395j through 1395w-4 (Part B – Supplemental Medical Insurance Benefits for the Aged and Disabled); 42 U.S.C. § 1395w-21 (Medicare + Choice Plan).

### 1. Medicare Part A

27.     Medicare part A is so called because the governing law is found in Part A of Title XVIII of the Social Security Act.  Some of the services that are covered under Part A include, without limitation:  (a) part-time or intermittent skilled nursing care and home health aid services; (b) physical, speech and occupational therapy; (c) medical equipment and supplies; and (d) social services.  *See* 42 U.S.C. §§ 1395 through 1395i-5 (Part A – Hospital Insurance Benefits for the Aged and Disabled).  TRICARE pays nursing facilities using the same system as Medicare. 10 U.S.C. § 1079(j)(2); TRICARE Reimbursement Manual 6010.58M, Ch. 8, § 2,4.3.5 - 4.3.7, 4.4.3.

8

28.     In order to receive coverage under Part A for SNF care, beneficiaries must continue to meet regular eligibility requirements.  Medicare Part A does not pay any benefits for custodial nursing home care; coverage is only provided under Medicare for skilled nursing care required following on a period of hospitalization for a disease or injury.  That is, a beneficiary must have been an inpatient of a hospital for a medically necessary stay of at least three (3) consecutive calendar days prior to becoming eligible for skilled nursing care under Medicare.  In addition, within thirty (30) days after discharge from a hospital stay or at least three consecutive calendar days, the beneficiary must have been transferred to a SNF that signed a participating agreement with CMS.  Further, the skilled nursing or rehabilitation services must be medically necessary and indicated.  42 U.S.C. § 1395x(i); HCFA Skilled Nursing Facility Manual, Chapter 2 – Coverage of Services, § 212, et seq.

29.     Medicare requires that a physician or other health care provider certify that the conditions affording coverage are met at the time of the patient's admission to the nursing facility or rehab program and to recertify the patient's continued need for skilled therapy services at regular intervals.  To be considered a "skilled service," it must be so "inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel," 42 C.F.R. § 409.32(a), such as physical, occupational or speech therapists. 42 C.F.R. § 409.31(a).

30.     Skilled rehabilitation therapy does not generally include personal care services or assistance with acts of daily living, other general exercises or range of motion treatments that can be administered by non-skilled staff, including exercises to improve gait, maintain strength or provide assistance with ambulation.  See 42 C.F.R. § 409.33(d); Medicare Benefit Policy Manual, Chapter 8, § 30.4.1.1.

9

31.     If a beneficiary meets these eligibility requirements, then Medicare provides one hundred (100) days of Part A SNF coverage per benefit period.  42 U.S.C. § 1395(a)(2).

### 2. Medicare Part B

32.     Medicare Part B provides supplemental medical insurance and only provides for payment of those services that are medically necessary.  *See* 42 C.F.R. § 410.3 (Scope of Benefits).

33.     Part B is a voluntary program financed in part through premiums paid by the participants.  Each Part B participant must pay a basic monthly premium as well as any deductible or co-insurance amount. See CMS Carrier Manual, Part 3, Chapter I – Entitlement and Enrollment, § 208.

34.     Part B is also funded by the Federal Government.  There are two ways that the government makes payment under Part B of the Medicare Program:  (1) directly to the physician or facility – the assignment method or (2) directly to the patient who is obligated to reimburse the physician or facility.  *See* CMS Carrier, Manual, Part 3, Chapter III – Claims Filing Jurisdiction and Development Procedures.

### B. Medicare Reimbursement and SNFs

35.     Section 4432(a) of the Balanced Budget Act ("BBA") of 1997 modified how payment was made by the government for SNF services.  Effective with cost reporting periods beginning on or after July 1, 1998, SNFs transitioned to the Prospective Payment System ("PPS").  Under the PPS, SNFs receive a fixed per diem rate for all Part A post-hospital extended care services.   In order to enroll in the Medicare program, SNFs must complete and

submit an application to obtain a National Provider Identification number ("NPI") on Form CMS-855A.

### 1. Setting Payment Rates (using RUGs)

36.     The initial payment rates to SNFs set in 1998 reflected the projected amount that SNFs received in 1995, adjusted for inflation.  The base payment rates were computed separately for urban and rural areas and were updated annually based on the projected increase in the SNF market basket index, a measure of the national average price level for the goods and services SNFs purchase to provide care.

37.     Daily payments to SNFs are determined by adjusting the base payment rates for geographic differences in labor costs and case mix.  To adjust for labor cost differences, the labor-related portion of the total daily rate – seventy-six percent (76%) for fiscal year 2007 – is multiplied by the hospital wage index in the SNF's location and the result is added to the non-labor portion.

38.     When a patient is initially admitted to an SNF, the facility is required to assess the patient to determine his or her appropriate Resource Utilization Group ("RUG") category. In order to ensure that patients are placed in the proper reimbursement category, the regulations require that each patient undergo a "comprehensive, accurate assessment to place them in the proper RUG category."  42 C.F.R. §483.20.  *See also* 42 U.S.C. § 1395yy(e)(b); 1395k-3(b)(3). That assessment requires completion of a Minimum Data Set ("MDS") by the SNF, along with other documentation.  Completion of the MDS is a prerequisite to payment under Medicare. *See* 63 Fed. Reg. at 26,265.

39.     CMS makes use of the RUG classifications to determine the per diem reimbursement for patients.  RUGs determine how much Medicare pays SNFs.  The daily base

rates are adjusted for case mix. Each RUG has associated nursing and therapy weights that are applied to the base payment rates. These weights were developed using time study data from 1990, 1995 and 1997. These weights have been updated since the implementation of PPS.

40.     The fifty-three (53) group RUG classification system went into effect January 1, 2006, replacing the forty-four (44) group RUG system. The 53 group system added nine (9) new payment groups for patients who meet the criteria for "extensive services" and "rehabilitation" groups. Patients are assigned to one of the 53 RUGs classifications based on patient characteristics and service use that are expected to require similar resources. In 2011 and 2012, CMS increased the number of RUGs from 53 to 66 in an attempt to allocate payments more accurately. 74 Fed. Reg. 40288, 40338 (Aug. 11, 2009).

41.     Assigning a Medicare beneficiary to one of the RUGs categories is based on the number of therapy minutes that the patient has used or is expected to use; the need for certain services (e.g., respiratory therapy or specialized feeding); the presence of certain conditions (e.g., pneumonia or dehydration); an index based on the patient's ability to perform independently four (4) activities of daily living (e.g., eating, toileting, bed mobility and transferring); and in some cases, signs of depression. Patients' characteristics and services use are determined by periodic assessments using the SNF patient assessment instrument known as the Minimum Data Set ("MDS"). The highest daily rate that Medicare will pay a nursing facility is reserved for those beneficiaries that require "Ultra High" levels of skilled therapy, or a minimum of 720 minutes per week of skilled therapy from at least two therapy disciplines.

42.     The structure of the RUG groups and daily PPS rate is adjusted periodically. The RUG-III classification was in place from January 1, 2006 through October 1, 2010. The RUG-

IV classification system has been in effect from October 1, 210 through the present. 70 Fed. Reg.

45026-01.

43.     There are seven RUG-III categories: rehabilitation, extensive services, special

services, clinically complex, impaired cognition, behavior and physical. 63 Fed. Reg. 26252-01.

The rehabilitation category is divided into five sublevels determined by the amount of time a

patient is required to be in therapy in order to achieve the expected therapeutic result.

   a.     Ultra High or Rehab Ultra requires 720 minutes of therapy per week, with
          two out of three therapy disciplines participating and one discipline
          providing services five (5) days a week.  The Ultra High level is
          intended for the most clinically complex patients who require
          skilled therapy services well beyond the average patient.

   b.     Rehab Very High requires 500 or more minutes of treatment per week and
          one discipline providing services 5 days a week or more.

   c.     Rehab High requires 325 minutes or more of treatment a week with one
          discipline providing services 5 days a week or more.

   d.     Rehab Medium requires 150 minutes of treatment from any of the 3
          disciplines at least 3 days a week.

   e.     Rehab Low requires 45 minutes of treatment a week from any of the 3
          disciplines for at least 3 days of the week.

44.     RUG levels also consider a patient's capacity to perform activities of daily living

("ADLs') such as toileting, eating, transfers and mobility.  ADL scores are broken into five (5)

different scores based on a person's capabilities ranging from categories A, B and C, which

involve rehabilitation that do not involve extensive services, to categories L and X, which

involve extensive services.  Using this scoring, the patient in need of the lowest level of services

would score an A, while the patient in need of the most extensive services would score an X.  74

Fed. Reg. 40288-01.  Therapy staff employed by Genesis Rehab would assess MDS information

as it relates to a patient's ability to perform ADLs, and such information would be included in the MDS data set for individual SNF to use and transmit to CMS.

45.     SNFs assess the beneficiary during what is called a "look-back" or "reference period." The length of the look back period can vary depending on the MDS item. For example, a seven day look back period is commonly used to determine the amount of skilled therapy that is provided. Defendants Program Managers would categorize each beneficiary into one of the five RUGs based primarily upon the number of minutes of therapy provided during the look-back period.

46.     A rehabilitation company or skilled nursing facility will assess a patient's RUG level and complete an MDS on the 5th, 14th, 30th, 60th and 90th days of the patient's stay at a facility. 42 C.F.R. 413.343(b). These periodic assessments determine the daily rate that Medicare will pay for skilled therapy services. 70 Fed. Reg. 45026-01. Further, facilities must complete a "change of therapy" assessment when the amount of therapy provided no longer reflects the RUG and an "end of therapy" assessment must be completed when therapy has been discontinued for three (3) consecutive days. Until those "end of therapy" and "change of therapy" assessments are completed, Medicare payments continue at the same level and rate as are indicated by the prior assessments.

47.     When a rehabilitation company or SNF submits a claim for a patient, the RUG category that determines reimbursement is indicated in Field 44 of the UB 92 Form, the standard CMS form used to seek reimbursement for patients residing receiving therapy services. The therapy provider enters a Health Insurance Prospective Payment System (HPPS) code in that field, corresponding to the RUG category into which a patient has been placed as a result of the

MDS.  In Field 46 on Form UB 92, the facility is required to indicate the number of days for which payment is sought and the rate applicable to the specified RUG category.

48.     The MDS form is required to be completed and submitted to the Government for all nursing home residents, including Defendants, who receive reimbursement from Medicare or Medicaid. 42 C.F.R. § 483.315.  SNFs use the MDS to assess each beneficiary's clinical condition, functional status, expected and actual use of services.   In the MDS, Defendants are required to provide the Government with an accurate and comprehensive assessment of each resident's functional abilities, identify health care problems and formulate a resident's individual plan of care.   MDS assessments are matched to claims submitted for reimbursement during a post pay review conducted by CMS to insure that the claims submitted match the patient's needs (RUG category) as determined by the MDS assessment. Each MDS assessment must be signed and certified as accurate by the health care provider responsible for coordinating MDS assessments within the SNF.  42 C.F.R. § 483.20(1).

49.     MDS assessments are signed by the individuals who complete all or a portion of the MDS form and contain the following certification: "I certify that the accompanying information accurately reflects resident assessment or tracking information for this resident and that I collected or coordinated collection of this information on the dates specified.  To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements.  I understand that this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for payment from federal funds.  I further understand that payment of such federal funds and continued participation in the government-funded health care programs is conditioned on the accuracy and truthfulness of this information and that I may be personally subject to and may subject my organization to

substantial criminal, civil and/or administrative penalties for submitting false information.  I also certify that I am authorized to submit this information by this facility or on its behalf."

50.     MDS assessments are transmitted electronically by Genesis Rehab and/or their SNFs to the MDS database in their respective states, which information is then captured into a national MDS data base at CMS.   In the case of MVNRC, that agency is the Virginia Department of Medical Assistance.

### 2.  Medicare Overpayments to Facilities

51.     Providers may not submit claims for services that are "of a quality which fails to meet professionally recognized standards of health care." 42 U.S.C. § 1320c-5(a)(2)(providers may not submit claims for inadequate care); 42 U.S.C. § 1320a-7b(a)(1) and (3) (criminal penalties for submitting false claims when a provider knows it has no continued right to receive payment).   Clinical practice requirements require that Defendants accurately document the number of therapy minutes provided to each beneficiary.  CMS RAI Manual 2.0, § 1.14.  In addition, providers must document in the medical record the care each beneficiary needs and receives, as well has how he or she responded to that therapy. Id.

52.     The Federal Government and the states share the cost of servicing Medicaid beneficiaries.  The specific percentage that the Federal Government reimburses a state is referred to as the Federal medical assistance percentage ("FMAP") and is calculated for each state according to a formula based on per capita income.  Pursuant to the express language of the FCA and its statutory definition of a "claim," Medicaid claims submitted to state Medicaid agencies are considered to be "claims" presented to the Federal Government, and as such, may give rise to liability under the FCA. *See United States ex rel. Tyson v. Amerigroup Illinois, Inc.*, 2005 U.S.

Dist. LEXIS 24032, 2005 WL 2667202 at *3 (N.D. Ill. 2005); *U.S. V. Ortho-McNeil Pharmaceutical, Inc.,* 2007 U.S. Dist. LEXIS 52666, 2007 WL 2091185 at *2 (N.D. Ill. 2007).

53.     When an incorrect payment is made to a SNF or Rehabilitation agency, the SNF is responsible for returning any overpayment unless the intermediary determines that it was without fault.

54.     Under the following situations, providers are liable for any overpayment: (a) when a SNF furnished erroneous information or failed to disclose facts it knew or should have known were relevant to payment of a benefit; (b) the overpayment was due to a mathematical or clerical error, e.g., an error in calculation by the SNF, or overlapping or duplicate bills; (c) documentation was not submitted to substantiate that the services billed to Medicare were actually performed; or (d) Medicare paid for services not covered under the program and the SNF should have known the services were not covered (e.g., medically unnecessary services).

### 3. Medicare Coverage for Reasonable and Necessary Services

55.     Coverage of health care services under Medicare is subject to the requirement that the services provided are reasonable and necessary for the treatment of an illness or injury or to improve the functioning of a malformed body part.  Health care services that fail to meet this requirement will not be reimbursed by the Government.  See 42 U.S.C. § 1862 (a)(1)(A).

56.     A specific health care service is necessary when it can be expected to make a meaningful contribution to the treatment of a patient's illness or injury.

57.     Though the health care service may serve a medically necessary purpose, the SNF must also consider to what extent, if any, it would be reasonable for the Medicare Program to pay for the item prescribed, taking into account the following considerations:

17

(a)     Would the expense of the item to the program be clearly disproportionate to the therapeutic benefits that could ordinarily be derived from use of the equipment?

(b)     Is the item substantially more costly than a medically appropriate and realistically feasible alternative pattern of care?

(c)     Does the item serve essentially the same purpose as equipment already available to the beneficiary?

(d)     Whether those same services could be provided as part of routine nursing care, including restorative care or wound care?

### 4. Cost Reports

58.     All Part A participating providers such as the Defendants are required to file cost reports each year with their fiscal intermediary.  The cost report serves as the health care provider's final claim for payment from Medicare for the services rendered to program beneficiaries for the fiscal period in question.  The cost report sets forth all of the provider's costs, accounts for the costs under applicable provisions of the Medicare statue and HHS program instructions, and results in a claim for a total amount of reimbursement for the fiscal year.  *See* 42 C.F.R. §§ 413.20, 413.24.

59.     In the cost report, providers must document the costs incurred in furnishing items and services to Medicare beneficiaries, such as costs arising from arrangements with outside suppliers to obtain items and services, including medical equipment and supplies.  *See* 42 U.S.C. § 1395g(a); 42 U.S.C. § 413.20(b).

60.     The cost report form requires a SNF or related entity providing skilled therapy services  to certify that he/she is "familiar with the laws and regulations regarding the provision of health care services and that the services identified in the cost report were provided in

18

compliance with such law and regulations." *See* 42 U.S.C. § 1395g(a); *See also* 42 C.F.R. § 413.24(f).

61.     Misrepresentation or falsification of any information contained in a cost report is punishable by civil, as well as criminal and administrative action, fine and/or imprisonment under federal law.  Further, if services identified in a cost report were provided or procured through the payment directly or indirectly of an illegal kick-back or referral, civil, criminal and administrative action, fine and/or imprisonment may result.  *See* 42 U.S.C. § 1395g (a); *See also* 42 C.F.R. § 413.24(f).

### 5. Group Therapy and Related Medicare Billing

62.     The regulations governing Medicare reimbursement for therapy also provide, as relevant here, that patients may be seen in group therapy sessions, but that these sessions may not be larger than four patients and therapy within a group setting can account for no more than twenty five percent (25%) of the Medicare resident's therapy regimen during the SNF stay.  Fed. Reg. Vol. 64, No.146, pp. 41,663 (July 30, 1999).   The Medicare regulations unambiguously provide that therapy minutes provided in a group setting above the 25% threshold and with more than four participants cannot be counted for reimbursement.  *Id.*

63.     Group and individual services have separate designations under Current Procedural Terminology ("CPT") codes, which are standardized billing codes published by the American Medical Association and which designate the type of service provided and the level of reimbursement allowed to the provider. For example when a therapist provides direct, one-on-one patient contact, the therapist bills for "individual therapy" and counts the total minutes of service to each patient in order to determine how many minutes should be provided. Individual

therapy must be billed using its own CPT code, 97110 (*e.g.*, $31.17 per 15-minute unit in Philadelphia and Metro Counties, a/k/a Charge Class 1).

64.     Therapists must be cognizant of whether the patient who they are treating is covered by Medicare Part "A" or "B." For example, when a therapist is providing supervision/treatment to two patients who are completing different activities at the same time, the Medicare Part "A" patient activity must be documented as "concurrent therapy minutes," whereas the Medicare Part "B" patient activity must be documented as "group therapy minutes." One-on-one therapy is documented as "Individual therapy minutes," along with the corresponding CPT code.

## VI.  General Allegations

65.     While employed by Defendants Genesis Healthcare and Genesis Rehab, Relators observed multiple practices designed to fraudulently overcharge Government Programs, including Medicare, Medicaid and TRICARE, for skilled therapy services, as more fully described below, including, but not limited to the following:

a.  Use of aggressive productivity billing requirements to promote the up-coding of Resource Utilization Groups ("RUGs") or reimbursement levels, which increased the billable rate of skilled therapies for patients who did not qualify for therapy or who did not meet the higher RUG levels based on their actual therapy needs;

b.  Providing skilled therapy to those patients who did not meet eligibility or reimbursement criteria for skilled therapy;

c.  Providing skilled therapy to patients who were terminal or at end of life.  Many such patients were not only ineligible to receive care, but suffered needlessly because of Defendants' systematic scheme of forcing skilled therapy on any Medicare patient because of the revenue generating opportunity that such patients presented;

d.  Treatment of patients in groups, who were improperly billed as receiving individual therapy;

e. Extending patients' lengths of stay beyond therapeutic needs in an effort to extend the length of time that a Medicare beneficiary would receive skilled treatment.  For some this involved pushing therapy on patients who were independent or at high functional levels simply because they experienced a fall or other change in condition,  but did not otherwise meet the criteria for skilled care;

f. Providing and billing for non-skilled therapy services, like walking, set up, ambulation to the bathroom, conversing with the patient or observing the patient on an exercise apparatus without providing any direct "hands-on" assistance;

g. Providing excessive and unnecessary skilled therapy to Medicare Part B patients, who did not meet reimbursement criteria for skilled therapy or qualify for extensions.  The corporate goal was attempt to recruit patients who by virtue of their underlying diagnosis (such as Parkinson's disease) would qualify for an automatic extension of Medicare rehabilitation therapy limits which ordinarily imposed temporal limitations on therapy, in an effort to bypass the Medicare caps on Med B and increase reimbursement from Medicare;

h. Mining or trolling for long term care or other patients who did not qualify for skilled care;

i. Falsifying records to increase billable minutes for data entries that were being transmitted to CMS for Medicare reimbursement purposes; and

j. In violation of the Stark Law, Defendants failed to provide alternative recommendations for referrals within their facilities.  For example, patients at assisted living facilities with long term care buildings in which Genesis was providing rehab services were only given the option of being treated by Genesis therapy staff.  The specific frauds summarized here are described in more detail below.

66.    In 2010 alone, Medicare paid a total of $26.4 billion for skilled care nationwide.

The United States Department of Health and Human Services, Office of the Inspector General

(HHS OIG), the General Accountability Office, and the Medicare Advisory Panel have all

expressed concerns about fraud and abuse in the SNF PPS system over the past decade,

particularly as it relates to rehabilitation therapy reimbursement.  According to these oversight

bodies, the process described above creates incentives for SNFs to bill for the higher-paying

therapy RUG categories.  Because payments under the RUG system are based upon the amount

of therapy a patient receives, or is expected to receive, rather than on patient characteristics and care needs, the PPS encourages SNFs to furnish therapy even when it is of little or no benefit. Further, patients often receive the minimum number of minutes to qualify them into a certain payment group, and SNFs may be incentivized to provide excess therapy during an assessment period, as alleged here. *See Questionable Billing By Skilled Nursing Facilities*, Department of Health and Human Services, Office of the Inspector General (OEI-02-09-00202) (December 2010); *Skilled Nursing Facilities, Providers Have Responded to Medicare Payment System By Changing Practices*, General Accountability Office, August 2002 (GAO-02-841).

### A.    Genesis Productivity Requirements Were Intended To And Did Increase Reimbursement From Medicare

67.    At all times alleged herein, Defendants Genesis Healthcare and Genesis Rehab and the SNFs identified herein, along with the John Does, were engaged in a corporate-wide practice and policy of maximizing billing for Medicare Parts A and B in the provision of skilled therapy and related services, irrespective of the patients' actual therapeutic needs.  As a product of design, such practices were widespread through the Genesis chain, including its operations in standalone SNFs and its increasing popular traveling therapy services, which allow SNFs to outsource their Medicare fraud.

68.    Upper level management of Defendant Genesis Healthcare and Genesis Rehab was aware of the improper and excessive billing of Medicare and promoted such overbilling through various corporate-wide policies and practices, including, but not limited to corporate productivity requirements, manipulation of the RUG classifications and strict oversight over their Program Managers ("PMs") to ensure that the maximum possible number of rehabilitation minutes were billed to Medicare, and that as many nursing home patients as possible were placed

into billable rehabilitation therapy programs.    As described below, management came up with company-wide productivity requirements focused on artificially inflating billable minutes for Medicare patients.  Defendants promoted these corporate-wide  productivity and RUG up-coding goals at corporate meetings, through regional visits with lower management, through employee evaluations, through additional incentive compensation and other means, as described herein. Defendant Genesis Healthcare and Genesis Rehab controlled their management staff through a series of economic incentives and disincentives that was focused on meeting corporate billing productivity targets, which were carefully tracked by sophisticated software programs that could measure the productivity and RUG level of individual therapists.    Those managers and administrators who could meet corporate goals and targets were rewarded whereas those who could not were reprimanded, and, at times, fired or constructively discharged.

69.    In order to maximize employee billable time to Medicare and inflate RUG levels, Defendants Genesis Healthcare and Genesis Rehab and their management staff, including its Rehab Directors and/or PMs, pre-assigned medically unnecessary patient therapy minutes to push the vast majority of their Medicare patients in the Very High and Ultra High RUG categories, the RUG categories that received the highest level of reimbursement from Medicare. Genesis Rehab also required its PMs, licensed physical, occupational, and speech therapists, and its therapists' assistants to spend an arbitrarily fixed percentage of their time at work on billable Patient Care Hours ("PCH").  That requirement insured that therapists would spend nearly their full eight hour work day on therapy that was billable to Medicare, which would increase the total minutes of therapy provided directly to patients, insuring that the patients met the requirements of the High or Ultra High RUGs.  The pressure to bill time meant that therapists were required to perform administrative duties (such as charting patients), not billable to Medicare, during their

own time, apart from the hours they worked for Genesis.  This corporate-wide initiative lead to the over-treatment of patients who did not qualify for skilled care and even resulted in dying patients being pushed into aggressive therapy against their own wishes.  In an effort to meet its goal of maximizing Medicare billable minutes and RUG levels, Defendants management staff, including their Program Managers, would often ignore the clinical judgment and recommendations of their own therapists

70.     Using sophisticated software including a program known as Rehab Optima X, Defendants generated various reports so corporate management could closely monitor Medicare financial targets.  This program allowed Defendants to monitor lengths of stay, productivity levels, Medicare minutes and RUG categories at every level of the corporate hierarchy.  Rehab Optima X also allowed Defendants to submit Medicare billing invoices.  In order to submit their billing statements to Medicare, the SNFs at which Genesis Rehab provides services rely upon the records generated by Genesis Rehab, including the Genesis Rehab Optima X computer data and Matrix Logs, which are used to bill Medicare.  Defendants' staff would also have input in the MDS data set that SNFs used to bill Medicare for their daily rate.  As a result of practices described herein, Defendants' staff, acting in concert with their SNFs, up-coded the MDSs for many patients, making them appear to have a higher acuity or level of illness, which in turn supported an inflated RUG level.  As noted herein, the SNFs at which Genesis Rehab provided therapist were well aware of the practices described above, and encouraged Genesis therapists to maximize reimbursement by maximizing rehabilitation therapy minutes.  Defendants Genesis Healthcare and Genesis Rehab used Rehab Optima X to collect data including minutes devoted to skilled therapy.  Such data was used by Defendants, their staff, and alleged John Doe conspirators to transmit thousands of improper and fraudulent claims to Medicare.

71.     Genesis Rehab refers to the percentage of time spent working on PCH – as opposed to non-billable time at the workplace - as "productivity." Genesis Rehab uses productivity standards to rate Genesis Rehab employees' workplace performance, and it is a factor in promotions, bonuses, raises, disciplinary measures, and termination decisions. The company has communicated this message as critical to its clinic-based employees.

72.     In March and April 2011, Genesis Rehab Services gave a webinar and teleconference entitled "Transforming the Patient Care Experience: Enhancing Patient Care Delivery" to therapists and PMs in an effort to increase billable time by emphasizing increasing employee "productivity." (In fact, Genesis defined employee "productivity" based upon the amount of time therapists spent on billable tasks.)  Genesis Rehab's slide presentation touted the company's investment in new software. The presentation also discussed a widespread, company-wide decline in "efficiency" from 2006 to 2010. A descending line graph demonstrated that employee billable time in 2010 was lower than the previous years. Another slide alerted the employees that 15% of the company's therapy gyms lost money in 2010.  The direct connection between productivity and the Company's financial health demonstrates that the Company's focus on "productivity" was designed solely to increase billable therapy time and increase the Company's revenues.

73.     According to Relator Ross and her peers, the message was clear – Genesis Rehab was losing money, and the therapists, therapist assistants, and PMs in the field would have to bill for more of their time at work to stem purported companywide revenue losses.  In order to effectuate this plan, Genesis Rehab increased the employees' "productivity" requirements. Although Genesis Rehab had a similar productivity program in place before Spring of 2011, the new program rolled out in Spring 2011 again increased the  requirement of how much time a

therapist had to spend on billable work that would contribute to "productivity" measures.  Under the new standards:

    a.      Therapists were required to spend 81.25% of their time at work on billable PCH.

    b.      Therapy Assistants were to spend 87.25% of their day (up from around 83%) on PCH, with agency therapists spending 90% of their time on PCH.

    c.      PMs, who are charged with supervising the operations, were required to spend 50% of their time billing patients.

74.     The Genesis Rehab policy of maximizing rehabilitation therapy to Medicare beneficiaries was also evident from a company-wide call that Genesis Rehab had with all employees on July 29, 2011. The purpose of the call was to discuss the company's reaction to anticipated income losses resulting from CMS's implementation in the coming year of a new RUG categorization system, known as RUG-IV.  During that call, Genesis Rehab management reminded its employees of "quotas" that had been previously established to insure that the maximum number of billable minutes of rehabilitation therapy were delivered during the therapists' work day. This was the continuation of an ongoing strategy that Genesis Rehab had previously adopted to increase its reimbursement from Medicare without increasing its costs for salaries or wages to therapists.

75.     Internal company documents show that Genesis Rehab implemented the corporate policy designed to "limit losses" due to changes in RUG-IV in early 2011. Genesis Rehab closely tracked the results of this corporate policy and, in response to company pressure, PCH increased company-wide at most Genesis Rehab facilities.  The transcript of the July 2011 call shows that in March 2011, the average total billable minutes per day for therapist hours on site

increased from 5.7 hours daily to 6.3 hours daily.  The average gain was 37 minutes per day for all Genesis Rehab therapists.  This policy was intended to increase the RUG levels of patients, emphasizing the Very High and Ultra High billing categories and focusing on the treatment of patients who received Medicare A and Medicare B benefits.

76.     The financial pressure to meet quotas was reinforced at the regional level as well as from the top corporate level at Genesis Rehab.  For example, in a memorandum sent by Genesis Rehab management to Genesis Rehab staff, including staff at Mount Vernon Nursing and Rehabilitation Center ("MVNRC"), a SNF where Relator Gardner worked, entitled "T4 Area 1" refers to "Items Needing Focus, wk 4/06-4/12/2011," which include "meeting budget."  The memorandum notes that "[f]or the month of March we are projecting to miss the budget by $58,000 in our area. . . . [s]ome of the sites are doing great and making budget month to month but on the other hand some of the sites miss . . . budget by big numbers . . . ."  The Memorandum goes on to state "PCH: kudos to all the sites who are running PCH above or at 75%. . . . here are our PCH goals and expectations.  Please let all staff know about it.  Contractors 90%, PMs 50%, Therapist 81.25%, Assistant 87%."

77.     The Genesis Rehab Clinical Operations Program Manager Bonus Incentive Plan for January 1, 2010 through December 31, 2010 reflects that managers who meet the stated productivity goals can be eligible for cash bonuses if they meet "productivity" their profitability goals.  These goals include meeting PCH quotas, keeping employee turnover below 21% and group therapy utilization at 15% or greater for the SNFs serviced by Genesis Rehab in the PM's area.  The link between PCH and a monetary bonus demonstrates that mandated increases in the PCH for each therapist impacted Genesis Rehab's profitability.

78.     The policy of increasing RUG levels to increase reimbursement was at all times supported and encouraged by staff.  In fact, when Relator Gardner questioned the decision by the Program Manager for the Genesis Rehab MVNRC Program, Jhoel Mercado, not to discharge patients from rehabilitation therapy who were in an MDS assessment period, or to provide medically unnecessary rehabilitation services to Medicare SNF patients, Mr. Mercado responded by saying that Genesis Rehab would do whatever MVNRC wanted, as "the customer was always right."

79.     Further, in August 2011, PM Sandy Cavanaugh held a meeting with Relator Ross and the other therapists at Elm Terrace, which is a continuing care retirement community located in Lansdale, Montgomery Court, Pennsylvania.  PM Cavanaugh reported on a Program Managers' meeting held the week before by Deb Pronzato, Genesis' Area Director.  Director Pronzato had reported that Cavanaugh's area was "at the bottom" for PCH or productivity.  At that time, Elm Terrace had a PCH of 77.7% for its rehabilitation gym.  Pronzato told PM Cavanaugh that she was offering an incentive to the Elm Terrace therapists.  If the Elm Terrace facility could raise its PCH to 81%, Area Director Pronzato would give each and every therapist a gift cards.  PM Cavanaugh also announced that therapists were expected to have a minimum PCH of 82%, and assistants were expected to have a minimum PCH of 88%.  If a therapist/assistant at Elm Terrace did not "consistently" have the minimum PCH, he or she would be put on an action plan.  Area Director Pronzato told PM Cavanaugh that "lots of people above her [Pronzato] are looking at our PCH."

80.     In addition to meeting these fixed standards, Genesis Rehab licensed therapists were required to spend non-billable time "screening" patients.  These nonbillable screenings are used by Genesis Rehab to convert potential patients into billable patients.  Patients may be

screened by licensed therapy staff upon admission or re-admission. Genesis Rehab screens long-term care and assisted living residents when medical or allied-medical staff documents a change in health status (e.g., recent surgery, condition deterioration, regression). Screening consists of a record review and patient observation and interview, though no hands-on testing is done. If the licensed therapist has reason to believe during a screening that the patient would benefit from therapy, they convert the screening into a billable "evaluation," which essentially becomes an intake for a new patient. Genesis Rehab then may draw up a "rehabilitation plan of care" establishing reasonable short-term goals and long-term outcomes for the patient. After the plan of care is established, a PM may obtain a physician certification for the services from an off-site physician, and, thereafter, bill Medicare for the treatment.

81.     Genesis Rehab arbitrarily set a quota which requires licensed therapists to convert 50% of all "screenings" into evaluations--to absorb new skilled therapy patients billable to Medicare – regardless of whether the patient required skilled therapy. This standard was intentionally put in place to increase billable minutes for Medicare patients, as increased minutes directly (and artificially) inflated RUG levels. Rehab Directors also referred to PMs, would pre-assign therapy minutes to patients even without performing the actual evaluations, in an effort to meet corporate mandated billable minutes.

82.     Genesis Healthcare and Genesis Rehab judge their employees' ability to meet productivity and screening standards and disclose the results in employee performance reviews. Failure to meet productivity and screening-to-billable-patient standards may be grounds for employee corrective course of action, which is a prelude to firing if the employee does not begin to consistently meet Genesis productivity goals.

**B.      Genesis Pulls Non-Eligible Beneficiaries into Medicare A and
         B Programs to Inflate RUG reimbursement Levels**

83.     Trolling for patients to boost Medicare minutes was corporate-wide practice

taking place through the Genesis chain.  Nearly all of the named Relators witnessed this practice.

Management would instruct its staff to find Medicare Beneficiaries in the long term or assisted

living units to place into therapy when census was low.  The focus of recruitment was on

Medicare beneficiaries, especially ones who may qualify for Medicare Part B, automatic

extensions from limitations on the amount of therapy that could be billed to, and reimbursed by,

Medicare.

84.     Relator Gordon personally witnessed Genesis Rehab require its therapists to find

new patients from the existing population of patients living in the nursing home facilities.  In the

Rockingham facility where Gordon worked, many of the long-term patients were cycled in and

out of therapy for weeks at a time, given some time off, and then screened in again for more

weeks of therapy. Most of these patients did not meet the skilled therapy guidelines for

reimbursement, yet Medicare was intentionally and fraudulently charged such services.

85.     Therapists had various ways of finding new therapy patients. They would

accompany nurses on their rounds to find new patients; they would review a quarterly print-outs

and MDS reports on the Rockingham County computers, which often showed any decline or

improvement in patient conditions. This information was used to "screen them in."

86.     The trolling/screening process was based on getting the numbers required by

Genesis corporate.  Trolling for patients also included Genesis Rehab therapists walking around

to observe the nursing home residents while, for example, the patients were in the dining hall.  If

a resident appeared to demonstrate an issue with eating, walking or moving they would be

evaluated and screened in for therapy.  The Genesis PM informed the therapists that this was part of their job. It was well known among the therapists that most of the trolled patients did not require any therapy, either because they had already had therapy and failed to show improvement or progress toward meeting therapy goals, or because they knew the patient would not be able to progress due to the inherent limitations of their underlying condition.  The corporate-wide trolling initiative insured that there was a consistent pool of new patients to meet Genesis Rehab's productivity goals and RUG levels.

87.     In Rockingham, Genesis Rehab hung color posters on the walls throughout the nursing home announcing a program which encouraged employees to request therapies for the residents. The posters read: "Hey Therapy ... We are proud to announce a new program that encourages employees to request a therapy evaluation for a resident.  Who can refer residents to Therapy? An employee can! Where do I get the "Hey Therapy" forms? They are on EVERY resident Unit & Nursing Office." Attached to the poster is a yellow sheet which says "HEY THERAPY! I've noticed that (blank space to be filled in)(Resident's Name & Room#) may require therapy services and here's why ... Needs help walking/unable to walk as far; Needs help managing steps, stairs/curbs; needs help with transfers; loses balance or experiences frequent dizziness . . .." The poster went on to list 21 other separate categories of "symptoms" which could be the basis for evaluations and screening in residents for therapy.

88.     The 26 total categories of symptoms listed on the poster encompassed almost any problem a person could have.  Many of the patients in the potential patient pool suffered from chronic conditions that would not benefit from skilled therapy services, yet the demonstration was used to justify screenings and new therapy admissions.

89.     The vast majority of patients who were evaluated were ultimately admitted for therapy, regardless of medical need.  Relator Gordon observed that most of the trolled-in patients did not need the therapy they were provided and the therapy goals did not correlate to their functional needs.

90.     The excessive treatment for the trolled patients was so apparent and well known that it was an open joke among the therapists. In most cases, the patients, the nursing home residents at Rockingham had already undergone weeks of therapy, for the same symptoms used to re-admit them for more therapy. The residents of the nursing home were part of a pool of prospective therapy patients who were re-cycled through the Genesis therapy program as part of Defendant's ongoing corporate productivity requirements, which focused on billable minutes at the expense of a patient's actual needs.

91.     One nursing home patient who was trolled in and admitted for therapy to Genesis at Rockingham was Patient H.M.  Relator Gordon first met H.M. in April 2011.  He suffered from chronic obstructive pulmonary disease and lived in the nursing home.  He was frail, used a walker and also suffered from dementia. H.M. made it clear that he hated therapy. Ostensibly he had been placed in therapy because he would sometimes fall. However, Relator Gordon and other therapists had observed that the only place H.M. fell was in the bathroom, and that was because he routinely left his walker outside the bathroom door. The therapy did not in any way address his reason for falling; despite this he was repeatedly trolled in and screened in for therapy for weeks, which charges were improperly and fraudulently billed to Medicare.

92.     Relator Gordon treated H.M. for a period of time but when he refused treatment, Relator Gordon spoke with Mrs. Carmichael, her PM, and told her that H.M. wasn't a suitable candidate to be on therapy. Mrs. Carmichael responded: "If you can't get him to work with you, I

will ask another therapist to do it." After a period of weeks, H.M. was discharged from therapy. A couple of months later, Relator Gordon saw that H.M. had been re-evaluated, again for the exact same reason (falling) and was screened in and admitted for further therapy. As was the normal protocol, the evaluation form would find its way to a physician weeks later, would be signed by the doctor without any meaningful review. These charges were improperly billed to Medicare because the therapy was not medically necessary, and at an inflated RUG level.

93.    When H.M. was re-admitted for more therapy, Relator Gordon again told Mrs. Carmichael that H.M. would only fall in the bathroom because he left his walker outside, and that no amount of therapy could change this reality.  Mrs. Carmichael kept H.M. in the therapy, refusing to discharge him despite his medical condition and despite what Relator Gordon had told Mrs. Carmichael about H.M.  Defendants caused such charges to be improperly billed to Medicare at an inflated RUG level.

94.    Another nursing home patient who was trolled in at Rockingham was R.G. He had suffered a stroke in years past and lived at the nursing home. When Relator Gordon first treated R.G. in April of 2011, he was appropriate for treatments and she saw that he benefitted from them. R.G. was in his 80's, spent most of his days reading and he had trouble with positioning. Sometimes he would slide out of his chair. Genesis Rehab kept R.G. in therapy on and off for months. After the third admission, it was apparent to Relator Gordon that R.G. was not benefitting from continued therapy.  In addition, R.G.'s nurses asked Relator Gordon why R.G. was being kept on therapy. The Rockingham Nurse Manager, Joanne (last name unknown), asked Relator Gordon, "why are you picking him up again? He was already on therapy recently." Relator Gordon responded that she did not know why and that it was not her decision and she agreed that R.G. was not making any progress from the treatments. Relator Gordon spoke with

Mrs. Carmichael about discharging R.G. but Mrs. Carmichael's response was; "If you can't do it [render treatments], I will find someone who can."

**C.     Genesis Staff Falsified Evaluations, Patient Goals and Progress to increase Billing**

95.     Relator Ross personally witnessed Genesis Rehab, through its PMs, instruct therapists to discontinue objective medical testing and/or ignore results of objective testing when results did not demonstrate a need for new or continued skilled therapy. Typically, a therapist providing an evaluation types up an "Evaluation." A copy of the evaluation, containing the therapist's often exaggerated and false assertions about patient health conditions, is placed in the Genesis Rehab chart, and a copy is placed in the "hard" chart for a skilled nursing patient. Around the same time, the therapist fills out an Order for therapy without physician supervision or input. The Order includes therapy frequency and modes of treatment. A registered nurse then faxes the Order to a physician to sign and fax back.  Such orders were routinely signed by physicians without the physician undertaking an actual examination of the patient for purposes of assessing that patient's need for skilled therapy.

96.     For assisted living or independent living patients, the procedure is slightly different. The rehabilitation administrative personnel send a copy of the evaluation and pre-filled Order to a physician via mail. The physician then signs the Order and the Evaluation and mails it back for filing in the "hard" chart on site. The above procedures are the same for recertification.

97.     PMs routinely provide therapists with lists of patients, or potential patients, to screen. For example, at Elm Terrace Gardens, where Relator Ross worked, if a therapist screened a patient and the therapist determined that the patient's condition did not warrant skilled therapy,

the PM would instruct the therapist to write arbitrary, specific goals without regard to the patient's actual condition or needs despite the results of the evaluation.

98.     The Elm Terrace Gardens PM, on more than one occasion, instructed Relator Ross to cease performing objective testing - such as manual muscle tests and the Berg Balance Test, which can show whether a patient has met his goals or requires skilled therapy. Additionally, Genesis Rehab clinical specialists have required, and, upon information and belief, continue to require, that licensed therapists check their Berg Balance Test scores against the scores of PMs conducting the same tests, to ensure the scores closely match that of evaluating physical therapists. Similarly, Genesis Rehab, through its PMs, has directed therapists to arbitrarily document that all patients receive therapy to increase upper body strength, regardless of manual muscle testing results or patient needs. Genesis Rehab supervisors have instructed that therapists conducting evaluations to document arbitrary upper body strengthening goals for most patients.  This corporate-wide practice encourages therapists to provide unnecessary strengthening treatments that are not justified by any realistic functional gains.

99.     Genesis Rehab, through its PMs, maintains a falsely inflated case load by refusing to approve discharges of patients who have reached the maximum medical benefit of skilled therapy, such that their condition would neither decline without therapy nor improve with therapy. For example, in cases where a patient has met or exceeded all goals set forth in their original physical therapy order, Genesis Rehab PMs arbitrarily direct therapists and therapy assistants to continue providing billable skilled therapy services. Relator Ross has been ordered to participate in this fraud. The purpose for this continuing treatment is to keep these patients on caseload regardless of their actual condition and need for therapy, so that Genesis would have

more patients in therapy, and thus could bill Medicare for higher RUG levels.  This allegation also applies to patients receiving Medicare B.

100.    Relator Ross is aware that Genesis Rehab, through its PMs, instructed (and continues to  instruct) therapists and therapy assistants to provide false information to support medical necessity certificates in order to bolster Medicare billings at both the Elm Terrace Gardens and the Spring House Estates facilities.

101.    While working for Genesis, Relator Moore observed the corporate practice of improperly extending lengths of stay beyond the therapeutic needs of their Medicare patients. One way this was accomplished was to come up with unrealistic therapy goals, including goals that had functional requirements exceeding the patient's prior level of functioning.   Another way this was accomplished was to provide skilled therapy services for patients who were simply not appropriate or qualified to receive such services.

102.    Relator Gardner observed patients who had been wheelchair-bound prior to the hospital stay that triggered their SNF admission, but were still routinely given physical therapy to make them capable of unassisted walking, even though the goal was not obtainable. For example, patient D.S., who was confined to a wheelchair before her admission to MVNRC, was supposedly engaged in physical therapy, including gait training, for over 425 minutes over a seven-day period.

103.    Relator Gardner witnessed other MVNRC patients were admitted to rehabilitation therapy even though their prior medical history showed that rehabilitation therapy was not medically necessary. Patient M.N.'s medical records upon admission to MVNRC describe a patient who had already completed rehabilitation therapy during her qualifying stay at Inova Mount Vernon Hospital. M.N.'s records from Inova indicate that she had demonstrated limited

36

progress in rehabilitation therapy there. When Relator Gardner screened this patient, it was obvious that she had functional speech. Nonetheless, despite the fact that further rehabilitation therapy was not medically necessary, she was admitted to rehabilitation therapy, including speech therapy, for 30 days. Similarly, Patient F.L. was admitted to rehabilitation therapy even though her medical records from Inova stated that "no acute OT [is] indicated." These admissions are typical of Genesis' and MVNRC's approach to its skilled nursing patients; almost every patient underwent at least two weeks of rehabilitation therapy and sometimes more, regardless of whether it was medically necessary or not.

104.    At Rockingham, PM Carol Carmichael was in charge of scheduling patients' therapies. In accord with Defendants' corporate-wide practice, she would immediately set a treatment schedule mostly at the RUG Ultra High level, without evaluating the patient's actual needs.  She typically set the schedules without consulting the therapists, examining the patient records, or viewing the patients.

### D.    Genesis Rehab Falsely Inflates Billable Therapy Minutes To Hit Their RUG Goals

105.    Relator Ross personally knows that Genesis Rehab, through its PMs, has developed varied artifices to make incremental increases to its billing records, which has significantly increased RUG levels and bolstered Genesis Rehab's reimbursements from Medicare.

106.    These schemes include: a) billing for units of skilled therapy minutes that were never provided; and b) charging government-funded insurance programs for services those government insurance programs reimburse at a higher rate, when, in fact, services reimbursable at a lower rate were provided.

37

107.    The information that purports to justify Genesis Rehab's billing to government-funded medical insurance programs begins with the therapists and the therapy assistants providing hands-on care to patients. After furnishing skilled therapy to a patient, Genesis Rehab therapists and assistants are required to enter their billable therapy time into a software log organized by week. (Time spent entering the data is non-billable). They are required to enter the data contemporaneously or, at least, on the same day that the billable skilled therapy is provided. Once the therapist enters the data into the system (CPT codes and billable units of time), the data is then converted into the data for the Service Log Matrix, which is the basis for the skilled nursing facilities submission of bills to Medicare.

108.    Genesis Rehab, through its PMs, has at various times changed Medicare billing information before it became part of the Service Log Matrix (the source document for all Genesis Rehab billing) in order to inflate billable minutes and increase patient RUG levels. Relator Ross has witnessed that Genesis Rehab, through its PMs, has added, and continues to add, more minutes of skilled therapy than were actually furnished to billing records. Notably, Relator Ross has first-hand knowledge that Service Log Matrices reflect a falsely inflated version of skilled therapy minutes, when, actually, therapists and therapy assistants had documented far fewer minutes in their weekly logs.  In some cases, Relator Ross has seen the Service Log Matrix reflect minutes of service provided, when she knows the therapist who purportedly provided the service in fact did not do so.

109.    For example, on July 15, 2011, Relator Ross observed a physical therapist/supervisor place a hot pack on a patient and then leave the room. The therapist returned several minutes later without explanation. This intermittent "treatment" of the patient continued for a total of 45 minutes, though the treatment actually provided in that period of time actually

was much less. Yet the therapist, who is a PM at the Elm Terrace facility, billed for an entire 60 minutes. The therapy which the Service Log inaccurately shows was provided (the majority of which, Relator knows first-hand was not provided), included 15 minutes of therapeutic exercise, 15 minutes of gait training, 15 minutes of neuromuscular reeducation, and an additional 15 minutes of therapeutic activities, the last of which may have included the placement of the hot pack. Defendants improperly transmitted bills to Medicare for payment of these fraudulent services, which were, in fact reimbursed to Defendants.

110.     Another representative example of billing for skilled therapy service not provided is reflected on documentation of services purportedly provided on July 13, 2011. In this instance, a physical therapist/PM entered 60 minutes of therapy on the handwritten weekly therapist log, but she increased the billable time to 75 minutes as reflected in the Service Log Matrix.

111.     Management of Genesis Rehab, through their Program Manager, starts with arbitrary selection of patient productivity levels and billable targets for minutes and RUG levels. Without regard to patient need or impact upon their employees, a system is devised in which the vast majority of patients are pushed into the Very High and Ultra High billing categories, resulting in significantly inflated Medicare reimbursement. Though software known as Rehab Optima X, Genesis Rehab and their managers carefully track corporate productivity, while creating electronic invoices and billing Matrixes that were used to bill Medicare. As Relator Ross observed, false, upward adjustments occur widely in billing records at Genesis Rehab. Genesis Rehab therapists and therapy assistants have been instructed to falsely document the amount of time they have spent on services that Medicare reimburses at a higher rate, and to decrease the amount of time they have spent on services that Medicare reimburses at lower rates or does not reimburse, such as evaluations.

112.    Relator Ross has regularly observed Genesis Rehab employees include false billings in the Service Log Matrix. For example, on July 7, 2011, a physical therapy assistant treated two Medicare "B" patients at the same time. One was seen from 2:30-3:30 (60 minutes), and the other was seen from 2:30-3:15 (45 minutes). The Service Log Matrix reflects billing of individual therapy by the same physical therapy assistant at 60 minutes for both patients, on the same day and at the same time. As noted above, this is not permitted under Medicare regulations.

113.    Genesis Rehab, through its PMs, instructs therapists to falsely adjust the time they spend providing evaluations versus treatment in an effort to bolster their Medicare billing and corresponding RUG levels. Evaluations are provided in conjunction with an initial therapy session.  The evaluations take 45 minutes to conduct and are billable at a flat rate, and are followed by 30 minutes of therapy. PMs routinely instruct therapists to bill the evaluations at 30 minutes and bill the therapy, which is reimbursable at a higher rate than an evaluation, at 45 minutes. This results in a net gain of 15 billable minutes of therapy, which never was provided. In addition, Genesis Rehab bills for the full, flat reimbursement for the evaluation.

114.    Billable minutes and treatment data that therapists enter into Genesis Rehab software were falsely inflated by Genesis Rehab, through its PM, to bolster the productivity of individual therapists. Relator Ross became aware of this after noticing her PM had falsely inflated her productivity level. For example, on March 1, 2011, Relator Ross documented 81.88 percent productivity. Upon information and belief, her PM upwardly adjusted Relator Ross' productivity to 97%. In order to increase Relator Ross' productivity under the formula set forth above, Ross' PM would necessarily have had to increase the number of billable minutes entered for Ross that day, since the number of hours (i.e. the denominator for that equation) was fixed at the number of hours that Ross was assigned or paid to work that day by Genesis.  If true, this

40

would have meant that only 3% of Relator Ross' time spent at work on March 1, 2011 was spent not spent in directly providing, or supervising, direct care to patients, an impossible scenario, which did not, in fact, occur.

### E.    Genesis Over-treats Dying Patients Who Would be Better Served with Hospice Care

115.    In an effort to improperly inflate  Medicare billable minutes Defendants Genesis Healthcare and Genesis Rehab routinely treated dying patients who would have been better served with palliative or hospice care.

116.    On June 22, 2011, Relator Ross encountered patient J.B., a Medicare beneficiary who was transferred from the hospital following radiation treatment for metastatic cancer.  J.B. was terminal with no objective basis justifying occupational therapy.  He had severe COPD with moderate to severe pulmonary hypertension, an aortic aneurysm and he was on 4 liters of oxygen.  His oxygen levels would drop to potentially dangerous levels while therapy was being administered, requiring ongoing breaks to allow the patient to catch his breath.

117.    During J.B.'s evaluation on June 22, 2011, Relator Ross determined that the patient would benefit only from energy conservation strategies and should be placed in hospice care. While Relator Ross viewed this patient as an unqualified patient for skilled occupational therapy, her PM instructed her to pick the patient up for strengthening, dressing and bathing. Starting on June 23, 2011, J.B. was treated on June 23, 24, 28, 30 and July 1, 4, 5, 7, 8, 12 and 13.  Such service dates formed the basis for fraudulent billing which Defendants caused to be submitted to Medicare for skilled therapy services that were neither reasonable nor medically necessary and which improperly inflated the patient's RUG level.  Patient J.B. was transferred back to the hospital in mid-July; he died soon thereafter.  During this period, OTR Jodi Glazer

conducted and billed for strengthening and standing/kicking activities. COTA Lyne Alvarez instructed J.B. on how to propel himself in a wheelchair and billed this as skilled therapy.

118.    In July 2011, Relator Ross encountered Patient J.D., who was also terminal with no chance of obtaining objective functional gains through occupational therapy.  J.D. was completely reliant upon the staff for all ADLs and required hospice care.   However, the Genesis Program Manager assigned the patient to receive both occupational and physical therapy in an effort to inflate her minutes into the Ultra High RUG category.     Records reflect that from July 1 through July 16 she was treated  every day (except weekends) for an excessive number of minutes that placed her in the Ultra High RUG category on July 2, 4, 5, 6, 7, 8, 9, 12, 13, 14, 15, and 16.  J.D. died shortly after her treatment ended.  These inflated July billings formed the basis for fraudulent charges that Defendants, through their staff, caused to be billed to Medicare.

119.    In the summer of 2012, Relator Moore encountered Patient A, a Medicare beneficiary who was terminal. The patient had attempted to refuse therapy and was seeking comfort measures only.  In an effort to increase minutes, the Program Manager, as part of a corporate-wide practice, assigned Patient A skilled therapy to increase his minutes.  At the same time Defendants were pushing unnecessary therapy on patients who did not need it, neglected the patient's general nursing needs, like hygiene and toileting.  Patient A would complain that his general nursing needs were not being met while at the same time unnecessary therapy was causing him physical distress.

120.    Relator Gardner also witnessed the egregious practices of pushing dying patients into unnecessary skilled therapy and thus adversely impacting their remaining quality of life at MVNRC.   Patient O.T. was in a SNF bed at MVNRC on May 25, 2011 and, according to Program Manager Mercado, should have been under hospice care.  Mr. Mercado told the Relator

that MVNRC nursing staff refused to transfer him to hospice because "they need to keep him skilled" for reimbursement purposes.  This patient was scheduled for and received all disciplines of rehabilitation therapy, including OT, PT and Speech Therapy.

121.    Patients I.S. and L.C., who were patients at MVNRC, were discharged from Speech Therapy because they died in May 2011.  MVNRC Director of Nursing, Nancy Chila, instructed Genesis Rehab personnel not to list their deaths as a reason for their discharge on GRS records, apparently concerned that it might raise questions about whether they should have been in rehabilitation therapy at the time of their deaths.  MVNRC routinely admitted patients for rehabilitation, even if the patient should have been in maintenance or hospice care, in order to maximize RUG levels and Medicare reimbursement.

### F.    Up-coding RUGs by Ramping up and then Ramping Down

122.    The Assessment Reference Date (ARD) is the date that signifies the end of the "look back" period used by Medicare to determine a patient's level of care for purposes of reimbursement.

123.    Defendants' corporate-wide practices and goals encouraged their skilled therapy staff to maximize the number of minutes that they would spend with a patient during a look-back or reference period (the period used to determine a RUG level).   With most physical, occupational and speech therapy, one would expect the length of therapy sessions to decrease over time.  Either the patient improves, or if there is no improvement, therapy should be discontinued.   But the corporate practice of Defendants was to attempt to increase billing time during a reference period, irrespective of patient need. Defendants also improperly and fraudulently extended lengths of stay for numerous skilled therapy patients, which caused

increased and medically unnecessary expenditures by Medicare, Medicaid and TRICARE, as more fully described herein.

124.    While working for the Genesis Defendants, Relators Moore and Chasmar directly observed the corporate practice of maximizing treatment of Medicare patients who were in a look-back or reference period for purposes of placing these beneficiaries in the High or Ultra High RUG category.  In fact, as part of a corporate-wide practice, when receiving their patient assignments, management would pre-assign the anticipated minutes that each therapist was required to spend on each patient.   While working for Genesis at the North Cape May, New Jersey facility described above, Relator Chasmar was usually pre-assigned to work on patients 60 minutes a day during a reference period, in combination with a physical therapist who would be assigned a similar amount of minutes.  Finally, to get the maximum number of minutes, many times a speech therapist would be added to the treatment regimen even though the patient had no speech or swallowing abnormalities.

125.    While employed by Genesis Rehab, Relator Gardner observed similar use of speech therapy to obtain the maximum number of minutes needed during an assessment period. Because it was necessary for a patient to be receiving therapy in all three disciplines (OT, PT and Speech) to reach the highest rug levels, minutes were pre-assigned by management to these three disciplines in a carefully orchestrated corporate scheme to place most patients in the High or Ultra High RUG categories.

126.    While employed at Genesis Rehab, Relator Moore would encounter ventilator patients who were placed on his schedule.  Given their poor health status, many of these patients were not appropriate to receive either skilled occupational or physical therapy.  At Cameron Glen, Relator Moore refused to treat various Medicare patients who were on a ventilator and did

not qualify for skilled therapy services.  He would return to the facility to find that they had been reassigned to other therapists who would treat these patients during a reference period for purposes of improperly and fraudulently billing Medicare.  Many times patients who were not appropriate to receive skilled therapy services would be transferred to younger therapists who lacked the experience and knowledge necessary to question the Rehab Manger.   New graduates were being assigned 15 to 20 patients a day with the emphasis on maximizing patients in a reference period at the cost of neglecting other patients who either did not receive Medicare or who were outside a reference period.

127.    Relator Gordon also observed at Rockingham that after the patients had passed the Medicare ARD look-back periods and qualified at the highest reimbursement levels, their therapy schedules were purposely ramped down, solely for the purpose of increase company profits.  By ramping down the patient schedules after obtaining the highest level of reimbursement within the ARD period, Genesis assured that it would be paid at the higher reimbursement rate while, at the same time, significantly reducing its labor costs for therapists.

128.    The nationwide corporate practice of up-coding RUGs during a reference period was an intentional and fraudulent practice endorsed and ratified by Defendants Genesis Healthcare, Genesis Healthcare Corp. and Genesis Rehab, through their corporate management control over the Project Managers.  These Defendants also knew that the vast majority of their Medicare patients were being classified in the Very High and Ultra High RUG categories despite the fact that a much smaller percentage of these patients actually qualified for these high reimbursement categories.

129.    The rigors of aggressive Ultra High therapy, which anticipate at least two (2) hours of therapy a day, are not for everyone.  However, Defendants' corporate-wide program of

maximizing billable Medicare minutes required all patient populations to participate if the

program is to succeed.  Relator Gordon observed that some patients were not physically able to

sustain the rigorous Ultra High Medicare reimbursement schedules that were automatically set

for them. If Relator Gordon was attempting to treat a patient and the patient was unable to

continue with treatment, the Relator was required to report this immediately to Mrs. Carmichael.

Almost invariably, she would reply to Relator Moore, "you have to go back and find a way to get

them to do the therapy.  If not, I will give your minutes to someone else who can."  Occasionally

she would say; "If they are not in the assessment period I don't care but if they are in assessment,

you've got to get the time in with them."

130.    On June 17, 2011, when Relator Gardner indicated that he was prepared to

discharge a patient, F.O., from speech therapy, because she had made all of the progress she

could make under his care, he was told by the Genesis Rehab Assistant Program Manager,

Shannon Harris, to "check the projections," to see what effect ending speech therapy would have

on the RUG level.  Relator Gardner checked the projections and noted that ending speech

therapy changed the patient's RUG level from Ultra High (the highest reimbursed RUG level for

physical therapy) to Very High.  Ms. Harris told Relator Gardner that, "we'll have to increase

OT [Occupational Therapy] and PT [Physical Therapy] minutes to keep her in Ultra High," or

words to that effect.  The Service Matrix log for this patient indicates that, after she was

discharged from speech therapy, the minutes recorded for other therapy disciplines increased as

needed to keep the patient in the RUG Ultra High category.  By contrast, on June 15, 2011, when

Relator Garner wanted to discharge a patient, G.K., from speech therapy, Mr. Mercado

concurred, noting that the discharge was acceptable as the patient was "not in an assessment

period."  The Relator was told by Isa Kamara, a Registered Nurse in MVNRC's employ, that

46

"Nancy [Chila, the Director of Nursing for MVNRC] wanted G.K. discharged from speech therapy because it would reduce the workload for the nursing staff," who would then only have to supervise his feedings two times a day instead of three as required for the higher RUG level.

131.    Just before the next "look-back" period was scheduled, the minutes would be ramped up again to Ultra High in order to capture the highest reimbursement rates. These practices lasted until October 2011, when the Medicare assessment and reimbursement rates changed.

132.    The Daily Activity Schedules (DAS) for Occupational Therapy of several patients for 2011-2012 reveal the Defendant's scheme of heavy scheduling without regard to patient need and then ramping down after the ARD period was over: The schedules show the rapid ramp-down directly after the ARD look-back period. They include, but are not limited to, the following:

  a.  Patient J.P. (Medicare A):
      6/28/11(ARD period): 45 minutes
      6/29/11: 45 minutes
      6/30/11: 60 minutes
      7/3/11: 30 minutes
      7/4111: 30 minutes
      7/5/11: 30 minutes
      7/6/11: 30 minutes

  b.  Patient H.C. (Medicare A):
      6/28/11: 45 minutes
      6/29/11: 60 minutes
      6/30/1 I: 60 minutes
      7/1/11: 45 minutes
      7/3/11: 30 minutes
      7/4/11: 15 minutes

7/5/11: 45 minutes

    c.     Patient D.T. (Medicare A):

6/28/11: 45 minutes

6/29/11: 45 minutes

6/30/11: 30 minutes

7/1/11: 45 minutes

7/3/11: 45 minutes

7/4/11: 35 minutes

7/5/11: 25 minutes

7/6/11: 25 minutes

7/7/11: 25 minutes

7/8/11: 30 minutes

**G.    Specific Patient Examples Regarding the Various Fraud Schemes of Defendants**

133.    Relator Gordon treated the following patients, who received clearly excessive treatments at Rockingham, without any relation to their medical needs and all of the therapies were billed to the government and on information were paid by the government;

    a.     Patient S.A. was receiving Medicare Part A benefits.  Admission: July 17, 2011. Fractured femur; difficulty walking; diabetes mellitus. Therapy schedule was set at RUG Level Ultra to October 3, 2011. Ramped down after RUG level was met. Then ramped up again when in 7-day look back period to capture highest reimbursement amount.

    b.     Patient D.C. was receiving Medicare Part A benefits. Admission: March 7, 2011. Therapy schedule set to RUG Ultra High level minutes until he suffered a stroke. Despite the stroke, Mr. C. was kept on therapy and ramped down after his ARD assessment period on June 9, 2011. Mr. C. remained in long-term care unable to walk and was re-admitted to therapy several

times by OT and PT throughout the year as Medicare A and B.  Defendants sent fraudulent

billing to Medicare under both Medicare A and B, since this patient qualified for neither.

c.      Patient J.C. was receiving Medicare Part A benefits. Mrs. C. was a cancer patient

and very ill on the date of her admission on April 28, 2011. Her treatment schedule was set at

RUG Ultra High level until July 11, 2011, with no relationship to her medical needs. Mrs. C. was

placed back in therapy from October 10, 2011 through November 4, 2011.  The Relator observed

a number of therapy sessions where the treatment and minutes were highly excessive for Mrs.

C's condition. The Relator spoke to PM Carmichael about this and the need to discharge her

from therapy. Mrs. Carmichael refused to do so. Mrs. C. grew continually more ill, but was kept

on therapy until she was too sick to participate.  She was then sent to hospice where she died

shortly thereafter.   Defendants fraudulently billed Mrs. C's service to Medicare for the treatment

dates noted above, despite the fact that she received no objective benefit from such services, and

which actually caused her physical and emotional harm.

d.      Patient T.H. was receiving Medicare Part A benefits.  Mrs. H. was very ill when

she was admitted on July 12, 2011. The Relator observed that Mrs. H. had low blood pressure,

would do bed exercises and feed herself for function.  Mrs. H. was in her 90's and the Relator

asked Mrs. Carmichael why she had been screened in at all. Mrs. H. refused therapy most of the

time saying, "I can't do it, I'm too old and dying, why do you make me do this." Relator Gordon

asked Mrs. Carmichael several times to allow Mrs. H. to be discharged and she refused. Mrs. H.

died in November 2011, shortly after discharge.  Despite not being qualified to receive skilled

therapy, with no objective chance for improvement, Defendants continued to push their corporate

goal of forcing therapy on the dying, who would be better served with hospice care.

134.     Some of the therapy patients never recovered and died during therapy treatments. Relator Gordon recalls that the following patients who received excessive treatments without proper medical necessity and/or justification, which services were billed to and paid for by Medicare:

a.       Patient J.L. was approximately 83. Relator Gordon treated J.L., a resident in the Rockingham nursing home, when he was admitted on August 20, 2010.  He was given a series of treatments then discharged back to Rockingham. He was "trolled in" again in 2011 and again in early 2012. Based on her observations of Mr. L., Relator Gordon concluded from the very beginning that he should not be receiving skilled therapy services. She repeatedly spoke to PM Carmichael about this, but Mrs. Carmichael would not discharge him. At his second screen in, Mr. L. was thin and frail. Relator Gordon read his medical records which said that he had suffered several heart attacks and had a severe heart condition.  When Relator Gordon saw him after the last screen in, he appeared to be in pain, holding his hand to his chest and wincing. Relator Gordon noted that J.L. also looked pale and was breathing heavily; the short walk from his room had resulted in his experiencing severe fatigue, shortness of breath and pain. He told Relator Gordon that he was not feeling well and that he wanted to go back to his room. He also said "I am going to die soon, the treatments won't do any good." Mr. L's treatment schedules had been set at the highest RUG level, which, as described above is referred to as Ultra High. Based on Relator Gordon's observations, she was concerned for his safety and thought he might have a heart attack if the therapies continued.  Relator Gordon knew the patient could not tolerate this level of therapy. He was in his five day look-back period for Medicare B, which required at least 30 minutes, five days per week. Within the first few days of treatment, Relator Gordon went to Mrs. Carmichael's office and told her that Mr. L. could not tolerate the treatments and

50

that he was too ill and that she should really see for herself. Mrs. Carmichael responded that the

Relator should check to see if Mr. L. was still in his assessment period and if so, she would still

need to get in her 30 minutes of therapy with him. "If he's not in assessment, I don't care," Mrs.

Carmichael told Relator Gordon.  Relator Gordon continued seeing Mr. L. during his assessment

period, but his health worsened and the therapy sessions became too much for him to take.  He

pleaded to be left alone, saying that he was not feeling well. Relator Gordon observed a Physical

Therapist, Maura Ann Langely, press Mr. L. "Oh come on, you can do its ok," she said to him.

However, Relator Gordon saw and heard Mr. L.'s nurse Kim [last name unknown] ask PT

Langley to leave Mr. L. alone, more than once. Mr. L. also told Relator Gordon that his doctor

had told him that he had only a few months to live. Shortly after the assessment period, Relator

Gordon came in to work and was told that Mr. L. had died.

      b.     Patient P.R. was in her 80's, when she came to Rockingham on January 7, 2012

for therapy after a recent diagnosis of cancer. She was a Medicare A patient and was in severe

pain from her cancer. Also, Relator Gordon saw that Mrs. R. would throw up after each meal.

She was very weak and ill. Despite her condition, she was immediately scheduled for therapy

pursuant to the Ultra High RUG category. Relator Gordon recalls that Mrs. R. could not

participate in therapy from the very beginning. She said to Relator Gordon, "you just don't know

how sick I am." She was too weak to even wash or dress herself. She could not leave her bed and

could barely sit up. Despite this, when Relator Gordon told Mrs. Carmichael, she refused to

allow Mrs. R. to be discharged. Mrs. Carmichael transferred Relator Gordon's minutes to a COT

A saying, "I am sure they can get in these minutes." After approximately 6-7 days of reported

therapies with Physical Therapist and Occupational Therapist, Relator Gordon came in one day

to learn that Mr. R. had died.

c.      Patient J.F. was admitted to Rockingham on January 26, 2012 after he was in a car accident. Relator Gordon had treated him previously some months earlier. Mr. F. was in his late 80's and had sustained fractures of his ribs and fingers. He also suffered from severe back pain and was not able to eat well. In addition, J.F. had dementia and could not recognize the people around him. Despite these ailments, he was screened in and scheduled for the highest level of treatment for Medicare reimbursement, Ultra High. Relator Gordon told Mrs. Carmichael that he should be taken off therapy right away but she adamantly refused to do so. Relator Gordon tried to render treatment to J.F. but he was too ill to tolerate it. Because he was not eating or drinking, he became weak. It appeared to Relator Gordon after a few days that he was dying. He would lie in bed and would not eat or drink. Relator Gordon told Mrs. Carmichael that he was very ill and could not tolerate treatments. Mrs. Carmichael responded: "at least see him for activities of daily living (ADL) to get in some minutes." Despite J.F.'s obvious decline and inability to undergo treatments, he was kept on schedule so that the company could maximize his RUG level.  Finally, his family intervened and J.F. was sent to the Rockingham hospice program where he died within a couple of days.

135.    Relator Ross witnessed numerous instances of falsely inflating physical therapy billable hours or billing for patients who did not need therapy by Genesis therapists and program managers.  She specifically recalls the following patients received excessive treatments unrelated to medical necessity and knows that their care was billed to and reimbursed by Medicare. Many of these individuals  were, or should have been, in hospice care and died during the treatment period:

a.      Patient G.M. came to Genesis Rehab following a hospital stay at Lansdale Hospital, where she was admitted for heart failure and aspiration pneumonia with vomiting.  On

July 27, 2011, a substitute PT named Cheryl Lynn Tymonko attempted to evaluate patient G.M.

G.M. was a retired physician who refused the evaluation.  Relator Ross was then asked to

conduct the evaluation, but G.M. refused again, saying that she did not require therapy.

Thereafter, PM Sandy Cavanaugh instructed Cheryl Lynn Tymonko to conduct a full evaluation

of patient G.M., which she did, setting arbitrary and medically unnecessary goals for

improvement for G.M, including range of motion exercises and therapy to improve her ability to

sit.  Based on her education and training, Relator Ross believes that G.M. would not have

materially benefitted from any physical or occupational therapy, as is required by 42 C.F.R. §

409.44(c)(2).

      b.     PM Sandy Cavanaugh placed patient J.D. (Medicare Part B) on a skilled therapy

regimen improperly; Cavanaugh claimed that J.D. had to be "trialed" in OT and PT before being

transferred to hospice.  At the time of the evaluation, J.D. presented with advanced dementia and

required total assistance with all activities of daily living. After two weeks of therapy – during

which the patient required total assistance with any activity and made no gains – J.D. was

provided with hospice care, and died shortly thereafter. J.D. did not materially benefit from any

physical or occupational therapy, as is required by 42 C.F.R. § 409.44(c)(2).

      c.     As noted above, in an effort to artificially inflate minutes and RUG levels,

Genesis PMs would assign therapists to treat patients who did not require skilled care.  When

census was down, the staff was encouraged to find patients from assisted living and even

independent living units.

      d.     On February 25, 2011 Relator Ross encountered patient E.B., a Medicare

beneficiary, who had sustained a fall in the parking lot of  her assisted living unit. She had

advanced dementia and was actively dying.  She had no objective chance to improve her physical

functioning, yet she was assigned excessive minutes of skilled therapy in a corporate-wide effort
to artificially inflate therapy minutes and RUG levels for all Medicare patients. E.B. was making
minimal progress, so Relator Ross recommended that the patient be transferred to skilled
nursing. In addition, E.B. was having significant feeding difficulties. The patient spent several
days in the hospital in mid-March 2011 (urinary tract infection and atelectasis), then was
transferred to a skilled nursing facility. At that time, E.B. was on a puree diet and required total
assistance for feeding and max to total assistance for most daily activities. E.B. was
inappropriate for therapy. She was readmitted to the hospital on April 10, 2011 and passed away
on April 12, 2011. During that time, E.B. received the following therapy:

> OT Evaluation -        2/25/11
>
> Daily OT treatment -  2/25 – 3/23/11
>
> OT Evaluation -        3/28/11
>
> Daily OT treatment -  3/24-4/8/11
>
> PT Evaluation -        2/25/11
>
> Daily PT treatment -  2/25 – 3/23/11
>
> PT Evaluation -        3/28/11
>
> Daily PT treatment -  3/24-4/8/11
>
> ST evaluation -        3/23/11
>
> ST evaluation -        3/27/11
>
> Daily ST treatment -  3/28 - 4/7/11

Through billing Medicare on the above dates, Defendants Genesis Healthcare and Genesis Rehab
artificially inflated the RUG levels and intentionally caused fraudulent submissions to be paid for
skilled care that was not necessary.

e.      Defendants routinely pulled unqualified patients into Medicare Part B, often focusing on patients who would meet automatic exceptions for Medicare Part B extensions.  PM Sandy Cavanaugh placed patient G.W.F. on a skilled therapy regimen to use up his Medicare Part B benefits.  G.W.F., a 92-year old patient, was moved from her assisted living apartment into the skilled nursing facility at Elm Terrace due to advancing dementia, as the assisted living facility staff was unable to provide the level of care she required.  PM Cavanaugh also reported that G.W.F. was experiencing low back pain.  G.W.F. was evaluated by OT Jeane Marie Coviello on June 10, 2011.  The OT documented bilateral knee pain and lower back pain. The patient had no reports of any pain in her follow-up OT sessions.  Because the client has osteoarthritis, her care was an automatic exception to the therapy cap, which made her an attractive client for Genesis.  After treating the patient twice – on June 16 and June 22 – Relator Ross recommended to PM Cavanaugh that G.W.F. be discharged.  Instead, G.W.F. was treated for at least two more weeks (June 10, 2011 through July 7, 2011) by Genesis therapists, including COTA Lyne Alvarez and COTA Melissa Sherretta.  Both of these clinicians works on upper extremity strengthening and range of motions exercises for G.W.F.  These were non-skilled services that formed the basis for improper Medicare reimbursements that Defendants caused to be submitted to Medicare.

f.      Patient J.M. (Medicare Part "B"), who lived in an assisted living apartment, was referred to Genesis Rehab because she appeared unkempt and her apartment conditions were unsafe.  Relator Ross evaluated this 81-year-old resident of Elm Terrace on June 24, 2011.  Relator Ross found that J.M. was living independently – preparing her own cold meals (hot meals were provided by the facility) and adequately managing her own medication and bathing herself while standing.  J.M.'s brother and niece were managing her financial needs and helped

her get out in the community.  When Relator Ross informed PM Sandy Cavanaugh that the

patient required no Occupational Therapy (OT), PM Cavanaugh instructed Relator Ross to write

a goal to provide therapy to permit the patient to "transfer to/from a shower chair and

demonstrate her ability to use an electric water kettle."  At the time, the patient showered

standing up without incident and reported that she did not require a shower chair, making this

goal medically unnecessary.

136.    Similarly, Relator Ross was instructed by PM Cavanaugh to evaluate patient L.O.,

a 90-year old patient with Parkinson's disease.  PM Cavanaugh claimed that a nurse had reported

that L.O. needed increased assistance for dressing and bathing.  When Relator Ross spoke to the

appropriate nurse, she denied making such a request.  After her evaluation of patient L.O. (June

23, 2011), Relator Ross reported to PM Cavanaugh that no skilled OT needs were required.  PM

Cavanaugh disagreed and told Relator Ross that COTA Lyne Alvarez had spoken to the patient's

aide and the patient's aide reported that L.O. needed more assistance with dressing and bathing.

PM Cavanaugh instructed Relator Ross to write goals for these skills and to add L.O. to the

patient caseload.  Relator Ross wrote a goal for upper body dressing and a goal for upper body

bathing, per PM Cavanaugh's directive.  Relator Ross completed a Progress Report for L.O. on

July 13, 2011; in that report, Relator Ross add the following quote, based on statements made to

her by L.O. – "I can do everything, but it just takes me a really long time so I ask for help.  I try

to save my energy for the things I enjoy."  Based upon PM Cavanaugh's  false treatment order,

the following Genesis therapists treated L.O. over the next several weeks (June 23, 2011 to July

19, 2011) – COTA Lyne Alvarez (upper body strengthening, although no goal set per treatment

order), COTA Melissa Sherretta, Occupational Therapist, Registered, Licensed ("OTR/L") Janet

Clare Burke, and OTR/L Jodi Glazer.

137.    While at Cameron Glen, Relator Moore encountered patient E.H. on or about June 30, 2013.  Patient E.H. was a 57-year old woman who was in a persistent vegetative state. Moore determined that this woman was not appropriate for skilled therapy as she had no chance of improving her functional status.  Moore informed the Rehab Manager of his unwillingness to treat patient E.H.   However, the Rehab Manager ignored the clinical judgment of an experienced Occupational Therapist and subsequently reassigned the patient to another therapist, who treated the patient for 45 to 60 minutes a day so that she could be placed in a High RUG category.  As patient E.H. was receiving Medicare Part A in June and July of 2013, Defendants caused improper and fraudulent charges to be passed on to Medicare for a patient who never should have received skilled therapy services.

138.    While employed by Genesis Rehab at Cameron Glenn, Relator Moore observed Defendants' practice of using Medicare Part B to bill Medicare for patients who did not qualify for skilled care. On October 3, 2011, Mr. Moore encountered M.F., a Medicare beneficiary and auto accident victim.  M.F. was a wheelchair-bound long-term care patient, yet Defendants picked him up for both PT and OT to artificially inflate his RUG level and fraudulently bill Medicare. Examples of unnecessary therapy included skilled therapy in ambulation where there was no realistic change of functional gains.

### COUNT I
### Violations of FCA -Presentation of False Claims
### 31 U.S.C. § 3729(a)(l)(A)

139.    Relator alleges and incorporates the foregoing allegations as if the same were set forth herein.

140.     This Count is brought by Relator in the name of the United States under the qui tam provisions of 31 U.S.C. § 3730 for the Defendants' violations of 31 U.S.C. §3729(a)(1)(A).

141.     By virtue of the above-described acts, among others, the Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval, and upon information and belief, continue to present or to cause to be presented false or fraudulent claims for payment or approval within the meaning of §3729(a)(l)(A).

142.     Defendants, in concert with the local SNFs, who participated in this fraudulent scheme, manipulated the information in MDS, which resulted in false and inaccurate RUGs as well as improper submissions to Government Programs.  Genesis Rehab, through the use of its Computer Program Rehab Optima, provided the data that formed the basis for thousands of fraudulent Government submissions that were paid by Medicare, TRICARE and/or Medicaid. These claims were fraudulent because the Genesis Defendants made requests or demands for payment from Medicare where (1) the payments were conditioned on Defendants' compliance with state and federal regulations, and the Defendants fraudulently certified compliance; (2) the Defendants failed to comply with the regulations, and compliance was a condition of payment; and/or (3) the Defendants submitted claims for services they claimed to perform but failed to perform, or never performed.

143.     The corporate management of Genesis Healthcare and Genesis Rehab, through its conduct, directives and corporate-wide  programs, and through their direct influence over the Program Manager, fraudulently and with intent to deceive, improperly inflated billable minutes and RUG levels as described herein, causing  fraudulent billings to Medicare, Medicaid and TRICARE.   The monies the Defendants obtained through their billing for services provided to Medicare beneficiaries were provided in whole or in part by the United States Government and

funneled up the Genesis corporate chain to the parent companies, Genesis Healthcare and

Genesis Healthcare Corp.

144. Plaintiff United States, unaware of the falsity of the claims and/or statements

which the Defendants submitted and/or caused to be submitted to the United States, and in

reliance of the accuracy thereof, has paid, and continues to pay, the Defendants for services that

would otherwise not have been paid and/or were ineligible for payment.

145. Plaintiff United States, being unaware of the falsity of the claims and/or

statements caused to be made by Defendants, and in reliance on the accuracy thereof, paid and

continues to pay for the Defendants' unlawful Medicare and Medicaid claims.

146. The Defendants' compliance with Medicare regulations was material to the

governments' decision to disburse funds to the Defendants.

147. Relators estimate that the United States has suffered damages in excess of $100

million.

148. Relators believe and aver that they are the original sources of the facts and

information upon which this action is based.

### COUNT II
### Violations of FCA- Making or Using False Records
### or Statements to Cause Claim to be Paid
### 31 U.S.C. § 3729(a)(l)(B)

149. Relators re-allege and incorporate the foregoing allegations as if the same were

set forth herein.

150. This Count is brought by Relators in the name of the United States under the qui

tam provisions of 31 U.S.C. § 3730 for the Defendants' violations of 31 U.S.C. §3729(a)(1)(B).

59

151.    Defendants, in concert with the local SNFs, manipulated the information in MDS, which resulted in false and inaccurate RUGs as well as improper submissions to Government Programs.  Through the above-described acts, among others, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims on the Government, and upon information and belief, continue to engage in such conduct, by accepting and continuing to accept governmental Medicare monies for services.

152.    The Defendants' actions were in violation of the FCA because (1) the payments were conditioned on the Defendants' compliance with state and federal regulations, and Defendants fraudulently certified compliance; (2) the Defendants failed to comply with the regulations, and compliance was a condition of payment; and/or (3) the Defendants submitted claims for services they claimed to perform but failed to perform.

153.    The Defendants created and/or used false records and/or statements that were material to the Government's decision to pay reimbursements for skilled therapy services provided to Medicare beneficiaries. The false records and/or false statements influenced or had a natural tendency to influence or were capable of influencing Highmark, CMS or other intermediaries and/or payors to pay government monies to the Defendants.

154.    Defendants' corporate-wide strategy and internal corporate pressures significantly increased the number of days that it billed Medicare patients at the Very High and Ultra High RUG levels.

155.    Plaintiff United States, unaware of the falsity of the records or statements made, used, or caused by Defendants, and in reliance on the accuracy thereof, has paid and approved and continues to pay and approve, Medicare monies to Defendants for services that it would not have paid or approved in any part if the truth were known.

156.     By reason of the Defendants' wrongful conduct, the United States has suffered

and continues to suffer substantial damages. The United States is entitled to full recovery of the

amounts paid by it to the Defendants for the false Medicare claims, plus a penalty of treble

damages.

**COUNT III**
**Violations of FCA- Conspiracy**
**31 U.S.C. § 3729(a)(l)(C)**

157.     Relators reallege and incorporate the foregoing allegations as if the same were set

forth herein.

158.     This Count is brought by Relators in the name of the United States under the qui

tam provisions of 31 U.S.C. § 3730 and for Defendants' violations of 31 U.S.C. §3729(a)(l)(C).

159.     Through the acts described above and otherwise, Defendants entered into a

conspiracy or conspiracies to defraud the United States by getting false and fraudulent claims

allowed or paid in violation of 31 U.S.C. § 3729(a)(3), and, as amended, 31 U.S.C. §

3729(a)(l)(C).  Defendants also conspired to omit disclosing or to actively conceal facts which, if

known, would have reduced Government obligations to them or resulted in repayments from

them to the Medicare program.  Defendants, acting in concert with various SNFs who provided

many of Defendants' patient referrals, falsely and fraudulently documented information in the

MDS records which resulted in the fraudulent up-coding of their RUG  and reimbursement

levels.

160.     Defendants and their agents and employees have taken substantial steps in

furtherance of those conspiracies, inter alia, by preparing false records, by submitting claims for

reimbursement to the Government for payment or approval, and by directing their agents and personnel not to disclose and/or to conceal its fraudulent practices.

161.    The United States, unaware of Defendants' conspiracy or the falsity of the records, statements and claims made by Defendants and their agents and employees, and as a result thereof, has paid and continues to pay millions of dollars that it would not otherwise have paid.

162.    Because of the false records, statements, claims, and omissions by the Defendants and their agents and employees, the United States, being unaware of the falsity of the claims and/or statements caused to be made by Defendants, and in reliance on the accuracy thereof, paid for the Defendants' unlawful Medicare claims.

163.    As a direct result of Defendants' actions as set forth in the Complaint, the United States has been damaged, with the amount to be determined at trial, and is also entitled to statutory penalties.

164.    Relators aver that they are original sources of the facts and information on which this action is based.

### COUNT IV
### Violations of FCA, 31 U.S.C. §3729(a)(l)(as amended)

165.    Relators reallege and incorporate the foregoing allegations as if the same were set forth herein.

166.    This Count is brought by Relators in the name of the United States under the qui tam provisions of 31 U.S.C. § 3730 (as amended) for Defendants' violations of 31 U.S.C. §3729(a)(l) (as amended) for acts occurring at the time, or before, Genesis Rehab began operating through May 2009.

167.    By virtue of the above-described acts, among others, Defendants knowingly presented or caused to be presented, false or fraudulent claims for payment or approval to Highmark, other intermediaries similar to Highmark, and/or CMS within the meaning of Section 3729(a)(1).

168.    These claims were fraudulent because the Defendants accepted governmental Medicare monies for services where, (1) the payments were conditioned on Defendants' compliance with state and federal regulations, and Defendants fraudulently certified compliance; (2) the Defendants failed to comply with the regulations, and compliance was a condition of payment; and/or (3) the Defendants submitted claims for services they claimed to perform but failed to perform.

169.    Plaintiff United States, unaware of the falsity of the claims and/or statements which the Defendants submitted and/or caused to be submitted to the United States, and in reliance of the accuracy thereof, paid the Defendants for services that would otherwise not have been paid and/or were ineligible for payment.

170.    Plaintiff United States, being unaware of the falsity of the claims and/or statements caused to be made by the Defendants, and in reliance on the accuracy thereof, paid for the Defendants' unlawful Medicare claims.

171.    The Defendants' compliance with Medicare regulations was material to the governments' decision to disburse funds to the Defendants.

172.    By reason of the Defendants' wrongful conduct, the United States has suffered substantial damages. The United States is--entitled to full recovery of the amounts paid by it to the Defendants for the false Medicare claims, plus a penalty of treble damages.

173.    Relators believe and aver that they are the original sources of the facts and information on which this action is based.

**COUNT V**
**Violations of FCA, 31 U.S.C. § 3729(a)(2) (as amended)**

174.    Relators reallege and incorporate the foregoing allegations as if the same were set forth herein.

175.    This Count is brought by Relators in the name of the United States under the qui tam provisions of 31 U.S.C. § 3730 (as amended) for Defendants' violations of 31 U.S.C. § 3729(a)(2) (as amended) for acts occurring at the time, or before, Genesis Rehab began operating through May 2009.

176.    Through the above-described acts and otherwise, the Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim on the Government, and upon information and belief, the Defendants engaged in such conduct by accepting governmental Medicare monies for services where, (1) the payments were conditioned on the Defendants' compliance with state and federal regulations, and Defendants fraudulently certified compliance; (2) the Defendants failed to comply with the regulations, and compliance was a condition of payment; and/or (3) the Defendants submitted claims for services they claimed to perform but failed to perform.

177.    The Defendants created and/or used false records and/or statements that were material to the Government's decision to pay reimbursements for skilled therapy services provided to Medicare beneficiaries. The false records and/or false statements influenced or had a natural tendency to influence or were capable of influencing Highmark, intermediaries similar to Highmark, CMS and/or other payors to pay government monies to Defendants.

64

178.     Plaintiff United States, unaware of the falsity of the records or statements made, used, or caused by Defendants, and in reliance on the accuracy thereof, has paid and approved and continues to pay and approve, Medicare monies to the Defendants for services that it would not have paid or approved in any part if the truth were known.

179.     Relators believe and aver that they are original sources of the facts and information on which this action is based.

**COUNT VI**
**Maryland False Claims Act, Md. Code Ann. §2-601 et seq.**

180.     Relators reallege and incorporate the foregoing allegations as if the same were set forth herein.

181.     This is a claim for treble damages and civil penalties under the Maryland False Health Claims Act of 2010, Md. Code Ann. § 2-601 et seq.

182.     By virtue of the misrepresentations and submissions of non-reimbursable claims described above, Defendant knowingly presented or caused to be presented to the Maryland Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

183.     The Maryland Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

184.     By reason of these payments, the Maryland Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT VII
### Massachusetts False Claims Act, Mass. Ann. Laws ch. 12,§ S(A)-(0)

185.    Relators reallege and incorporate the foregoing allegations as if the same were set forth herein.

186.    This is a claim for treble damages and civil penalties under the Massachusetts False Claims Act, Mass. Ann. Laws ch. 12,§ 5(A)-(O).

187.    By virtue of the misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Massachusetts Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

188.    The Massachusetts Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

189.    By reason of these payments, the Massachusetts Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT VII
### New Hampshire Medicaid Fraud and False Claims
### N.H. Rev. Stat. Ann. § 167:61-b, et seq.

190.    Relators reallege and incorporate the foregoing allegations as if the same were set forth herein.

191.    This is a claim for treble damages and civil penalties under the New Hampshire Medicaid Fraud and False Claims Law, N.H. Rev. Stat. Ann.§ 167:61-b, et seq.

192.    By virtue of the misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the New

Hampshire Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

193.    The New Hampshire Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

194.    By reason of these payments, the New Hampshire Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT IX
### New Jersey False Claims Act, N.J. Stat. §§ 2A:32C-1 et seq.

195.    Relators reallege and incorporate the foregoing allegations as if the same were set forth herein.

196.    This is a claim for treble damages and civil penalties under the New Jersey False Claims Act, N.J. Stat. §§ 2A:32C-1 et seq.

197.    By virtue of the misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the New Jersey Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

198.    The New Jersey Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

199.    By reason of these payments, the New Jersey Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT X
### North Carolina False Claims Act, N.C.G.S §§1-605 et seq.

200.    Relators reallege and incorporate the foregoing allegations as if the same were set forth herein.

201.    This is a claim for treble damages and civil penalties under the North Carolina False Claims Act, N.C.G.S §§1-605 et seq.

202.    By virtue of the misrepresentations and submissions of non-reimbursable claims described above, Defendant knowingly presented or caused to be presented o the North Carolina Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used a false record or statement.

203.    The North Carolina Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

204.    By reason of these payments, the North Carolina Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT XI
### Rhode Island False Claims Act, R.I. Gen Laws§ 9-1.1-3 et seq.

205.    Relators reallege and incorporate the foregoing allegations as if the same were set forth herein.

206.    This is a claim for treble damages and civil penalties under the Rhode Island False Claims Act, R.I. Gen Laws§ 9-1.1-3 et seq.

207.    By virtue of the misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Rhode Island

Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used a false record or statement.

208.    The Rhode Island Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

209.    By reason of these payments, the Rhode Island Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT XII
### Virginia Fraud Against Taxpayers Act, Va. Code Ann.§ 8.01-216.1 et seq.

210.    Relators reallege and incorporate the foregoing allegations as if the same were set forth herein.

211.    This is a claim for treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 et seq.

212.    By virtue of the misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Virginia Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

213.    The Virginia Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

214.    By reason of these payments, the Virginia Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT XIII
## District of Columbia False Claims Act, D.C. Code Ann. § 2-381.01 et seq.

215.     Relators reallege and incorporate the foregoing allegations as if the same were set forth herein.

216.     This is a claim for treble damages and civil penalties under the District of Columbia False Claims Act.

217.     By virtue of the misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the District of Columbia false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

218.     The District of Columbia, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otheiWi.se would not have been allowed.

219.     By reason of these payments, the District of Columbia has been damaged, and continues to be damaged in a substantial amount.

## PRAYER FOR RELIEF

WHEREFORE, Relators, on behalf of themselves and the United States Government and the states of Connecticut, Delaware, Maryland, Massachusetts, New Hampshire, New Jersey, North Carolina, Rhode Island, and Virginia (collectively the "States") and the District of Columbia, requests the following relief:

(a) Judgment against all Defendants in the amount of three (3) times of the amount of damages the United States of America has sustained because of the Defendants' actions, plus a civil penalty of $10,000.00 for each action in violation of 31 U.S.C. § 3729, and the appropriate fines and penalties for violating the protective federal laws applicable to the fraudulent and false

70

conduct and the cost of this action with interest; plus the appropriate amount to the States and the District of Columbia under similar provisions of the analogous state and city statutes;

(b) That Relators be awarded all costs incurred, including reasonable attorneys' fees;

(c) In the event the United States proceeds with this action, Relators be awarded an appropriate amount for disclosing evidence or information that the United States did not possess when this action was brought to the government, of at least 20% but no more than 30% of the proceeds of the action or settlement of the claim. The amount awarded to Relators also includes the results of government actions or settlement of claims resulting from the expansion of claims through the government's further investigation directly generated from or attributable to Relators' information, and, further, that Relators be awarded an appropriate share under similar and analogous provisions of the State False Claims Acts;

(d) In the event the United States chooses not to proceed with this action, all amounts which the Court decides is reasonable for collecting the civil penalty and damages, in accordance with 31 U.S.C. §3730(d)(2);

(e) Pre-judgment interest at the highest rate allowed by law; and

(f) Such other relief as this Court deems just and appropriate.

## JURY TRIAL DEMAND

Relators demand a trial by jury of all issues so triable.

Respectfully submitted,

**ROSS FELLER CASEY, LLP**

/s/ Brian J. McCormick, Jr.
Robert Ross, Esq.
Joel J. Feller, Esq.
Matthew A. Casey, Esq.
Brian J. McCormick, Jr., Esq.
One Liberty Place
1650 Market Street, Suite 3450
Philadelphia, PA 19103
Tel.: (215) 574-2000
Fax: (215) 574-3080
bmccormick@rossfellercasey.com

**ASHCRAFT & GEREL, LLP**

/s/ Jamie M. Bennett
Jamie M Bennett, Esq.
4301 Garden City Drive, Suite 301
Landover, MD  20785
Tel.: (301) 459-8400
Fax: (301) 459-1364
jbennett@ashcraftlaw.com

**THE LAW OFFICES OF JEFFREY J. DOWNEY, P.C.**

/s/ Jeffrey J. Downey
Jeffrey J. Downey, Esq.
VA Bar No. 31992
1225 I Street, N.W.  Suite 600
Washington, D.C. 20005
Tel.: 202-712-9120
Fax:202-789-1116
jeffdowney@dmggroup.com